T.C. Memo. 2005-28

UNITED STATES TAX COURT

ELIZABETH GILES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10918-02.                    Filed February 17, 2005.

<u>Dwight M. Montgomery</u>, <u>Tracie Pham</u>, and <u>B. Paul Husband</u>, for petitioner.[1]

<u>Michael S. Hensley</u>, for respondent.

---

[1] <u>Dwight M. Montgomery</u> (Montgomery) and <u>Tracie Pham</u> petitioned the Court on behalf of petitioner. Montgomery represented petitioner by himself at her ensuing trial on Dec. 15, 2003. On Jan. 14, 2004, Montgomery withdrew from the case, and <u>B. Paul Husband</u> (Husband) entered his appearance on behalf of petitioner. Husband prepared both of petitioner's briefs.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioner petitioned the Court to redetermine deficiencies of $7,191 and $6,040 in her 1997 and 1998 Federal income taxes.  Following petitioner's concession as to a procedural matter concerning the notice of deficiency, we are left to decide as to those years whether petitioner's activity of breeding and showing horses (horse activity) was an "activity not engaged in for profit" under section 183.[2]  We hold it was.  Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

I.  Background

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith.[3]  Petitioner resided at 18500 Falling Water Way, Riverside, California (Falling Water Way property), when her

---

[2] As discussed herein, petitioner showed her horses at various competitions.  The parties use the term "showing" interchangeably with the term "competing", and so do we.

[3] In addition to the stipulations, petitioner's opening brief asks the Court to take "judicial notice" of documents that were filed in this case and statements made in prior Opinions of this Court.  We give those documents and statements proper consideration without regard to "judicial notice" as that term is used in Fed. R. Evid. 201.

petition to this Court was filed. She was almost 60 years of age at the time of her trial.

Petitioner is single, and she filed as such on each of her Federal income tax returns for 1988 through 2002. She has an individual retirement account (IRA) for which she deducted contributions of $2,000 for each of the years from 1988 through 1992. The record does not disclose whether she made any other contributions to the IRA.

II. Petitioner's Dental Practice

Petitioner is a dentist. She graduated from dental school in 1981, and she has practiced dentistry ever since. She started her own dental practice in 1983, and she has continued to date to work in or for that practice.

In or about 1987, petitioner incorporated her dental practice as Elizabeth Giles, D.D.S., Inc. (Giles Inc.). She is the sole shareholder of Giles Inc., and she is one of its employees. From 1988 through 2002, she worked 4 days a week as a dentist for Giles Inc., for a total of 36 hours per week, and she received wages from Giles Inc. in the following amounts:

| Year | Wages |
|------|-------|
| 1988 | $110,863 |
| 1989 | 108,000 |
| 1990 | 126,194 |
| 1991 | 111,515 |
| 1992 | 108,287 |
| 1993 | 108,456 |
| 1994 | 114,611 |
| 1995 | 109,086 |
| 1996 | 105,453 |

| | |
|---|---|
| 1997 | 96,283 |
| 1998 | 89,250 |
| 1999 | 120,500 |
| 2000 | 106,250 |
| 2001 | 138,250 |
| 2002 | 89,250 |
| Total | 1,642,248 |

As of the date of her trial, she had no imminent plans to stop practicing dentistry.

Since 1996, Giles Inc. has operated out of a building in Rialto, California. Petitioner personally owns that building and the land thereunder, both of which she purchased in 1996 at a total cost of $136,445 and which she has leased to Giles Inc. since 1996. During each of the years 1996, 1997, 1998, 1999, 2001, and 2002, Giles Inc. paid petitioner rent of $24,000 as to this lease; Giles Inc. paid petitioner rent of $22,000 in 2000. For 1997 through 2002, petitioner reported on her Federal income tax returns that she had realized net income from this lease of $6,382, $6,052, $7,944, $6,659, $7,202, and $5,225, respectively. For 1996, petitioner reported on her Federal income tax return that she had realized from the lease a $12,357 net loss stemming primarily from her payment of $16,950 in expenses for repairs.

Giles Inc. pays a bookkeeping service to maintain its books and records in accordance with applicable laws and regulations. The bookkeeping service has established for Giles Inc. a complete and accurate bookkeeping system that the bookkeeping service uses to prepare financial statements for Giles Inc. and to prepare

Giles Inc.'s Federal and State tax returns.  The record does not contain any of Giles Inc.'s financial statements or indicate a fair market value for Giles Inc. (or a fair market value for petitioner's interest in Giles Inc.).

III.  Falling Water Way Property

Petitioner purchased the Falling Water Way property in 1983. The Falling Water Way property is approximately 1-1/2 acres in size and includes the house in which petitioner lives, a barn, an arena (added by petitioner in August 1989 at a cost of $7,797) in which to train horses, four stalls in which to keep horses, and some pens.  Petitioner believed during the relevant years that the design of the Falling Water Way property allowed her to keep a maximum of six horses on the property.  As of the time of petitioner's trial, the fair market value of the Falling Water Way property was not more than $400,000.

Petitioner has paid mortgage interest and property taxes as to the Falling Water Way property in each year that she has owned it.  She deducted the full amount of these items on her Schedules A, Itemized Deductions.

IV.  Petitioner's Horse Activity

Petitioner enjoys horses and has been involved with them throughout her entire life.  In 1985, she joined the Arabian Horse Association, the California Arabian Horse Association, the United States Dressage Federation, and the Los Angeles Dressage

Federation (collectively, associations).  She also in that year hired a trainer.  The record does not establish whether petitioner has ever been an active participant in any of the associations or the purpose of this trainer.

In 1988, petitioner purchased a horse named Feyras Raehele for $11,000.  Feyras Raehele was the first horse that petitioner ever owned, and petitioner showed and bred this horse during 1988.  Petitioner also for 1988 began attaching to her Federal income tax return a Schedule C, Profit or Loss From Business, on which she deducted expenses related to Feyras Raehele.  (See the appendix for a list of the specific expenses that petitioner claimed as deductions for 1988 and for each year thereafter until 2002.  Other than the names of these expenses, which for the most part are the names given the expenses by petitioner on her Federal income tax returns, the record contains little to no information on the specifics of the expenses.)  She reported on the 1988 Schedule C that she had a business named "Falling Water Arabians", that its "principal business" was "Equine Investment", and that its address was that of the Falling Water Way property. She also reported on the 1988 Schedule C that this business had realized $95 of gross income during that year and that she was entitled to deduct with respect thereto $27,782 of expenses (including $7,195 of depreciation on $35,975 of assets inclusive

of Feyras Raehele, a $21,300 portable shelter, $1,975 of improvements, and a $1,700 saddle and tack).

In 1989 through 2002, petitioner acquired seven more horses, two by purchasing them and five through breeding as discussed infra. She reported on her Schedules C for those years that the name of her horse business was "Falling Water Arabians", and she reported on her 1989 through 1992 Schedules C that the address of this business was that of the Falling Water Way property.[4] On her 1989 through 1991 Schedules C, she reported that the "principal business" of Falling Water Arabians was "Horses". On her 1992 through 2002 Schedules C, she reported that the "principal business" of Falling Water Arabians was both "Breeding" and "Competing Horses".

During the subject years, petitioner did much of the feeding, cleaning, grooming, and training of her horses, which in those years numbered four and three, respectively, and she did all of the horses' worming and vaccinations.[5] She spent 30 hours per week with the horses, consisting primarily of time spent on the 3 days of the week that she did not work for Giles Inc. but also including time spent on each of the other 4 days of the

_____

[4] The 1993 through 2002 Schedules C left blank the lines for the address of Falling Water Arabians.

[5] The record does not reveal the frequency or number of times that petitioner wormed or vaccinated any of her horses or the amount of time that she devoted to those services.

week.[6]  She has never decreased the 36 hours per week that she has worked as a dentist to devote more time to the horse activity, and she has never increased the 30 hours per week that she has devoted to the horse activity.  She acknowledges that the raising of horses is a physical activity that will be more difficult for her to perform as she gets older.

Petitioner did not maintain a separate bank account for the horse activity, and she has never had business cards for the horse activity.  Nor did she keep many records for the horse activity.  The records which she kept for the horse activity consisted primarily of minimal pedigree, registration, health, breeding, and competition documents relating to some (but not all) of the eight horses which were part of that activity.

V.  Petitioner's Horses

A.  Overview

Petitioner has throughout her life owned a total of eight horses (the eight horses referenced above), one of which was stillborn and another one of which died 9 months after birth. The names of the seven horses which survived birth are Feyras Raehele, Kart Blanche, Silent Reign, Borissa, VT Kartel, Bogaz, and Censuous.  Following her sales of Silent Reign and Bogaz in

---

[6] The record does not reveal how much of the 30 hours per week for 1998 was attributable to time that petitioner spent with a horse named Silent Reign.  As noted below, petitioner sold Silent Reign on Dec. 31, 1997, but continued to keep it at the Falling Water Way property.

1997 and 2001, respectively, petitioner as of the time of her trial owned four horses, all of which are Arabian mares. As to the seven horses which survived birth, petitioner keeps and kept Feyras Raehele, Silent Reign, and Borissa at the Falling Water Way property; the record does not indicate where petitioner keeps or kept the other four horses.

Petitioner does not intend to sell any of the four horses that she owns, and she has only occasionally shown three of her eight horses; i.e., Feyras Raehele in 1988 and Kart Blanche and Bogaz in multiple years thereafter. She has bred only two of her eight horses; i.e., Feyras Raehele in 1988 and Borissa in 1990, 1991, 1997, and 2000, and she intends in the future to breed only one of her horses; i.e., Borissa. She received consideration only for the sale of Bogaz; as noted below, she sold Silent Reign to her daughter for no reported consideration.

B. <u>Feyras Raehele</u>

Feyras Raehele is a purebred Arabian mare that was foaled on May 19, 1979, and that is or was registered with the Arabian Horse Registry of America, Inc., as purebred Arabian horse No. 0193012. Its parents are Prince Tazzraf and Feyra Diba, both of which at the time of Feyras Raehele's registration were registered with the Arabian Horse Registry of America, Inc., and had lineage that included many other horses that were then so registered.

Petitioner purchased Feyras Raehele in January 1988 for $11,000, and she showed it during that year in at least one competition.[7]  She also during 1988 bred Feyras Raehele because the opportunity arose for her to pay $5,000 to breed it and any other mare an unlimited number of times with a stallion named GoKart that had previously commanded a breeding fee of $15,000. Petitioner considered this opportunity to be a good chance for her to breed Feyras Raehele with a respectable stallion at a significantly reduced fee.  She paid the $5,000 breeding fee in 1988, and she deducted this payment as an expense for 1988. Petitioner's 1988 breeding of Feyras Raehele with GoKart produced Kart Blanche.  This was the only time that petitioner has bred Feyras Raehele, and it was the only time that petitioner has bred a horse other than Borissa.

Petitioner continues to own Feyras Raehele, and she keeps it at the Falling Water Way property.  As of the time of petitioner's trial, the fair market value of Feyras Raehele was not more than $10,000.  The record does not indicate the amount of income, if any, that petitioner has realized from her ownership of Feyras Raehele.

---

[7] The record does not contain information on any show in which Feyras Raehele has competed, or whether Feyras Raehele has competed in more than one show.

C.  <u>Kart Blanche</u>

Kart Blanche is a purebred Arabian mare that was foaled on April 21, 1989, from the just-mentioned breeding of Feyras Raehele.  Kart Blanche is or was registered with the Arabian Horse Registry of America, Inc., as purebred Arabian horse No. 0428977.  Its parents are GoKart and Feyras Raehele, both of which at the time of Kart Blanche's registration were registered with the Arabian Horse Registry of America, Inc., and had lineage that included some other horses that were then so registered. Petitioner has never bred Kart Blanche.  Petitioner showed Kart Blanche from 1990 to 2000 at 34 competitions, and Kart Blanche won 3 of those competitions.

Petitioner continues to own Kart Blanche, and its fair market value as of the time of her trial was not more than $35,000.  The record does not indicate the amount of income, if any, that petitioner has realized from her ownership of Kart Blanche.

D.  <u>Silent Reign</u>

Petitioner purchased Silent Reign in 1989 for $3,500. Silent Reign has never been bred, shown, or otherwise used for profit in the horse activity.  Petitioner reported on her 1997 Federal income tax return that on December 31, 1997, she sold Silent Reign to her daughter for no consideration.  She reported on that return that she had claimed $3,339 of depreciation on

Silent Reign, that her adjusted basis in Silent Reign was $161 ($3,500 purchase price less $3,339 of claimed deprecation), and that she was entitled to recognize a $161 ordinary loss on this sale. The parties do not dispute that petitioner is entitled to deduct this reported loss as reported.

Petitioner continues to keep Silent Reign at the Falling Water Way property. Petitioner's 1997 through 2002 Federal income tax returns do not specifically report her receipt of any compensation for this service.

E. Borissa

Borissa is a purebred Arabian Polish mare that was foaled on February 24, 1982, and that is or was registered with the Arabian Horse Registry of America, Inc., as purebred Arabian horse No. 0268206. Its parents are Borexpo and Psyche, neither of which at the time of Borissa's registration was registered with the Arabian Horse Registry of America, Inc., and the lineage of which included no other horse that was then so registered.

Petitioner "leased" Borissa in 1989 for $1,000 in order to avail herself of her continued right to breed mares in exchange for the $5,000 breeding fee mentioned above, and she purchased Borissa in 1990 for $2,500.[8] Petitioner has bred Borissa a total of four times. She first bred Borissa in 1990 while she was

---

[8] The record does not elaborate on this lease or otherwise allow us to discern its terms.

leasing it. This first breeding produced VT Kartel. She bred Borissa a second time in 1991. This breeding, which apparently also was connected with petitioner's payment of the $5,000 breeding fee,[9] produced Bogaz on May 19, 1991.[10] She bred Borissa a third time between July 7 and September 30, 1997, in the sense that she paid a $3,000 breeding fee to the Bishop Lane Farm to board, care for, and breed (including possibly by artificial insemination) Borissa with a named stallion.[11] This breeding produced the referenced horse that was stillborn in 1998. She then bred Borissa a fourth and final time in 2000. This final breeding produced Censuous in 2001.

Petitioner continues to own Borissa, and she keeps it at the Falling Water Way property. As of the time of petitioner's trial, Borissa's fair market value was not more than $20,000. Borissa is the only horse that petitioner has bred since 1989,

---

[9] Although the contract underlying the $5,000 breeding fee refers only to GoKart, and the stallion that helped produce Bogaz was not GoKart, petitioner deducted no other breeding fees from 1988 until 1997.

[10] Although the record does not indicate the period of gestation for a horse such as Borissa, we recognize that the length of this pregnancy was 20 weeks at the most. Given that the parties have stipulated that Bogaz was the product of a 1991 breeding of Borissa and that the record establishes that Bogaz was foaled on May 19, 1991, we find the relevant dates of this pregnancy accordingly.

[11] Petitioner also paid as to this breeding a $250 fee for the transportation of semen. She deducted the total breeding fee of $3,250 ($3,000 + $250) for 1997.

and it is the only one of her horses that she will breed in the future.

F. VT Kartel

VT Kartel was a purebred Arabian stallion that was foaled in 1990 from the first breeding of Borissa. VT Kartel experienced medical complications contemporaneously with its birth, and it died in 1991 9 months after its birth.

VT Kartel was or is registered with the Arabian Horse Registry of America, Inc., as purebred Arabian horse No. 0449954. Its parents were GoKart and Borissa, both of which at the time of VT Kartel's registration were registered with the Arabian Horse Registry of America, Inc., but the lineage of which included no other horse that was then so registered.

G. Bogaz

Bogaz is a purebred Arabian stallion that was foaled on May 19, 1991, from the second breeding of Borissa. Bogaz is or was registered with the Arabian Horse Registry of America, Inc., as purebred Arabian horse No. 0468432. Its parents are Pegaz and Borissa, both of which at the time of Bogaz's registration were registered with the Arabian Horse Registry of America, Inc., but the lineage of which included no other horse that was then so registered.

Petitioner had Bogaz gelded. She showed Bogaz from 1992 and 2000 at 31 competitions. Bogaz won one of those competitions but

did not earn significant amounts of money as a show horse.[12]
Petitioner sold Bogaz in 2001 for $20,000.

### H. Censuous

Censuous was foaled in 2001 from the fourth breeding of
Borissa.

## VI. The Showing of Petitioner's Horses

Petitioner showed Feyras Raehele in 1988 at least once, but
she did not show Feyras Raehele during any other year.  From 1988
through 2000, she showed Kart Blanche and Bogaz at a total of 65
competitions, each of which was held by the International Arabian
Horse Association.  The specific numbers of times that petitioner
has shown Kart Blanche and Bogaz through 2000 are as follows:

| Year | Kart Blanche | Bogaz | Total |
|------|--------------|-------|-------|
| 1990 | 2 | 0 | 2 |
| 1991 | 0 | 0 | 0 |
| 1992 | 0 | 1 | 1 |
| 1993 | 6 | 0 | 6 |
| 1994 | 7 | 0 | 7 |
| 1995 | 5 | 5 | 10 |
| 1996 | 3 | 13 | 16 |
| 1997 | 2 | 1 | 3 |
| 1998 | 2 | 5 | 7 |
| 1999 | 3 | 3 | 6 |
| 2000 | 4 | 3 | 7 |
| Total | 34 | 31 | 65 |

---

[12] The record does not indicate the amount of income, if
any, that petitioner has realized from showing Bogaz.  Nor does
the record indicate the specific amount of expenses that
petitioner incurred during and as a result of her ownership of
Bogaz, or whether those expenses were greater than or less than
$20,000.

The record does not indicate the amount of income, if any, that petitioner earned from any of these competitions.

VII.  Relevant Financial Data

The attached appendix lists the gross income, specific operating expenses, depreciation, total expenses, and net income (loss) that petitioner reported for the horse activity on her 1988 through 2002 Schedules C.  With the exception of $20,000 that petitioner received in 2001 from the sale of Bogaz, we know nothing about the specific source of the other items of reported gross income.  While some of those other items of income may have been prize money earned at shows, petitioner reported some of the amounts of these other items net of cost of goods sold, which indicates to us that not all of those amounts were prize money from the shows.

From 1988 to 2002, petitioner reported on her Federal income tax returns the following amounts of total income (exclusive of income (loss) from the horse activity), income (loss) from the horse activity, total income, and taxable income.

| Year | Total income (exclusive of income or (loss) from the horse activity) | Income (loss) from the horse activity | Total income | Taxable income |
|------|------|------|------|------|
| 1988 | $111,854 | ($27,687) | $84,167 | $56,874 |
| 1989 | 108,078 | (28,736) | 79,342 | 50,593 |
| 1990 | 126,236 | (37,973) | 88,263 | 56,944 |
| 1991 | 113,487 | (28,136) | 85,351 | 49,945 |
| 1992 | 109,003 | (29,545) | 79,458 | 45,438 |
| 1993 | 109,536 | (43,422) | 66,114 | 36,195 |
| 1994 | 116,888 | (34,072) | 82,816 | 55,677 |

| 1995 | 110,881 | (38,203) | 72,678 | 40,981 |
| 1996 | 94,609 | (37,313) | 57,296 | 27,896 |
| 1997 | 105,051 | (24,215) | 80,836 | 48,895 |
| 1998 | 95,693 | (21,068) | 74,625 | 45,228 |
| 1999 | 129,362 | (22,777) | 106,585 | 78,961 |
| 2000 | 112,940 | (17,649) | 95,291 | 63,531 |
| 2001 | 145,474 | 209 | 145,683 | 113,860 |
| 2002 | 94,486 | (27,072) | 67,414 | 44,953 |
| Total | 1,683,578 | (417,659) | 1,265,919 | 815,971 |

Petitioner projected at trial that the horse activity also would lose money for 2003.

VIII.  Gavilan Hills Property

Gavilan Hills is an area in California near Riverside, Lake Elsinore, and Corona, California.  In or about October 1990, petitioner purchased 11.53 acres of vacant, unimproved land in Gavilan Hills (Gavilan Hills property) at a cost of $70,000.  The Gavilan Hills property is approximately 10 miles from the Falling Water Way property.  Petitioner has never developed the Gavilan Hills property, and she has never kept any of her horses there. During the relevant years, she rode one or more of her horses on the Gavilan Hills property as a change of pace from riding it (or them) round and round in the arena on the Falling Water Way property.

Petitioner purchased the Gavilan Hills property aspiring to sell the Falling Water Way property, to build a house on the Gavilan Hills property, to move her residence to the Gavilan Hills property, and to design the Gavilan Hills property so that she could continue operating the horse activity on the Gavilan

Hills property and possibly expand that activity to include the boarding of horses. At or around the time that she bought the Gavilan Hills property, she abandoned this aspiration when she realized that she could not sell the Falling Water Way property at the price that she believed was necessary to fulfill her aspiration. Petitioner now intends to sell the Gavilan Hills property undeveloped.

Petitioner has paid property taxes for the Gavilan Hills property during each year that she has owned it. She has not claimed any of those taxes on the Schedules C that she filed for the horse activity.

## OPINION

This is yet another case of a high-salaried taxpayer claiming that she may reduce the income taxes payable on her salary by deducting losses incurred in a pastime that is allegedly engaged in for profit. We must decide whether petitioner's horse activity was "an activity not engaged in for profit" within the meaning of section 183 during 1997 and 1998. If it was, petitioner may not deduct for those years the amounts of losses greater than her income from that activity. Although petitioner argues in brief that respondent bears the burden of proof pursuant to section 7491(a)(1), petitioner's counsel (on behalf of petitioner) conceded at trial that petitioner bears the burden of proof. Petitioner also made a similar concession in

her reply brief when she opted not to object to a proposed finding in respondent's opening brief that petitioner bears the burden of proof on the basis of her counsel's concession. See Rule 151(e)(3) ("In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party"); see also Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002) (the failure to object to a proposed finding of fact may be treated as a concession of that proposed finding), affd. 353 F.3d 1181 (10th Cir. 2003); Morgan v. Commissioner, T.C. Memo. 2000-231 (same), affd. 23 Fed. Appx. 813 (9th Cir. 2001). We hold on the basis of these concessions that petitioner bears the burden of proof.[13]

Section 183, which applies to activities engaged in by individuals or S corporations, generally limits the deductions for an "activity not engaged in for profit" to the amount of gross income received from the activity. Sec. 183(a) and (b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are

---

[13] Even if the applicability of sec. 7491(a)(1) had been at issue, we would have concluded that it did not apply. Petitioner has not in this proceeding presented "credible evidence" on the substantive issue at hand. See Higbee v. Commissioner, 116 T.C. 438, 442 (2001); see also Blodgett v. Commissioner, ___ F.3d ___ (8th Cir. Jan. 12, 2005), affg. T.C. Memo. 2003-212. Nor has she proven that she complied with the requirements of sec. 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with respondent's reasonable requests. See Weaver v. Commissioner, 121 T.C. 273, 275 (2003).

allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[14]  Pursuant to the jurisprudence of the Court of Appeals for the Ninth Circuit, the court to which an appeal of this case most likely lies, an activity is engaged in for profit if the taxpayer's "predominant, primary or principal objective" in engaging in the activity was to profit.  Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212.  In this context, the term "profit" denotes economic profit, independent of tax savings. Id.; Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

Petitioner, as noted above, bears the burden of proving that she entered into and during each year in issue remained in the horse activity with a predominant, primary, or principal

---

[14] Sec. 162 deals with "trade or business expenses" which are "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business".  Sec. 212(1) and (2) deals with expenses for the "production or collection of income" or "management, conservation, or maintenance of property held for the production of income".  Deductions are generally allowable under sec. 162 for the expenses of carrying on an activity which constitutes a trade or business of the taxpayer.  See sec. 162; sec. 1.183-2(a), Income Tax Regs.  To be engaged in such a trade or business, "the taxpayer must be involved in the activity with continuity and regularity", and "the taxpayer's primary purpose for engaging in the activity must be income or profit". Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997).

objective of earning a profit.[15]  Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Wolf v. Commissioner</u>, <u>supra</u> at 713; <u>Beck v. Commissioner</u>, 85 T.C. 557, 570 (1985).  Whether the requisite profit objective exists must be resolved on the basis of all surrounding facts and circumstances.  <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.  A taxpayer's objective of profit need not be reasonable, but it must be bona fide.  <u>Golanty v. Commissioner</u>, <u>supra</u> at 426. While the analysis of a taxpayer's objective in engaging in an activity focuses on the taxpayer's subjective intent, the finder of fact need not rely solely upon the taxpayer's statement of intent but may resort to objective facts to decide the true intent.  See <u>Indep. Elec. Supply, Inc. v. Commissioner</u>, 781 F.2d 724, 726 (9th Cir. 1986), affg. <u>Lahr v. Commissioner</u>, T.C. Memo. 1984-472; <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.; see also <u>Wolf v. Commissioner</u>, <u>supra</u> at 713.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine factors to consider in ascertaining a taxpayer's objective in engaging in an activity.  These factors are:  (1) The manner in which the taxpayer carries on the

_____

[15] Sec. 183(d) provides a statutory reversal of the burden of proof if a taxpayer meets specified criteria.  Petitioner does not meet those criteria.

activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort spent by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  None of these factors is controlling in and of itself, and a decision as to a taxpayer's intent is not governed by a numerical preponderance of the factors.  Golanty v. Commissioner, supra at 426; Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

Petitioner relies primarily on her testimony to establish both her proposed findings of disputed facts and her objective as to the horse activity.  We give petitioner's uncorroborated testimony limited weight for that purpose.  See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding T.C. Memo. 1957-129; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Our perception of petitioner while viewing her testifying at trial coupled with our review of the record leads us to discount her uncorroborated testimony.  For the most part, she testified generally, vaguely,

and/or in reply to leading questions asked by her counsel during direct examination. Portions of her testimony also were inconsistent with other portions, with stipulated facts, and/or with documentary evidence. We illustrate the inconsistencies in petitioner's testimony through seven examples. First, she testified that she purchased her first horse, Feyras Raehele, in 1985. We find (and she has stipulated) that she purchased her first horse, Feyras Raehele, in 1988. Second, she testified that she purchased Feyras Raehele while she was going to dental school. Per her own admission, she completed dental school in 1981, 7 years before the actual year in which she purchased Feyras Raehele and 4 years before the year that she testified was the year in which she purchased Feyras Raehele. Third, she testified that she "contributed" Silent Reign to her daughter under an agreement whereby her daughter would breed Silent Reign and she and petitioner would split the profits. She reported on her 1997 Federal income tax return that she sold Silent Reign to her daughter during 1997 and that she was entitled to recognize a $161 ordinary loss on this sale. Fourth, she testified that she sold Bogaz in 2000 and that she purchased the Gavilan Hills property in 1991 for $7,000. The record establishes that she sold Bogaz in 2001 and that she purchased the Gavilan Hills property in 1990 for $70,000. Fifth, she testified that during the subject years she did all of the training of her horses. On

her Federal income tax returns for those respective years, she reported that she had paid $1,518 and $1,645 of "training" expenses during those years. Sixth, she testified in one setting that she currently owns three horses; she then testified in another setting that she currently owns four horses. She also first testified that she keeps breeding papers on most of her horses, but then, in reply to a question asked three questions later, testified that she keeps breeding papers on all of her horses. Seventh, she repeatedly referred to incorrect dates, and she specifically acknowledged during her testimony that her memory is poor.

We now turn to the nine enumerated factors and discuss them seriatim.

1. <u>Manner in Which the Activity Is Conducted</u>

The fact that a taxpayer carries on an activity in a businesslike manner may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Subfactors to consider in deciding whether a taxpayer has conducted an activity in a businesslike manner include (1) whether the taxpayer maintained complete and accurate books and records for the activity, (2) whether the taxpayer conducted the activity in a manner substantially similar to those of other comparable activities that were profitable, and (3) whether the taxpayer changed operating procedures, adopted new techniques, or

abandoned unprofitable methods in a manner consistent with an intent to improve profitability.  Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner argues that this factor favors her.  She asserts that she kept accurate books and records for the horse activity and that she changed her business behavior to reflect the marketplace.  She claims that her books and records were accurate in that respondent has not challenged the substantiation of the expenses reported on her Schedules C for the subject years.  She claims that she acted in a businesslike manner by (1) leasing Borissa before buying it and buying Borissa only after concluding that its foal, VT Kartel, was of "excellent" quality, (2) breeding only her best mare on account of space limitations, (3) not breeding any of her horses from 1992 through 1996, because she believed that the market included too many bad Arabian horses, but showing her horses during that period to increase their value, (4) resuming her breeding activity in 1997 when she believed that Arabian horses were again in demand, and (5) using written business plans for the horse activity.

We evaluate this factor by analyzing the three subfactors mentioned above.

A.  Maintaining Complete and Accurate Books and Records

The failure to keep financial records such as journals, ledgers, income and expenses reports, income statements, and

projections indicates a lack of businesslike operations. Surridge v. Commissioner, T.C. Memo. 1998-304.  The failure to maintain a separate bank account or to prepare a budget also indicates a lack of businesslike operations.  Id.

Petitioner did not maintain a separate bank account for the horse activity, and we do not find on the basis of credible evidence that she kept a separate set of books and records for the activity.  We also do not find on the basis of credible evidence that petitioner, as to the horse activity, prepared financial statements, profit and loss projections, budgets, break-even analyses, or marketing surveys, each of which may aid a taxpayer in cutting expenses, increasing profits, and evaluating the overall performance of an activity, Golanty v. Commissioner, 72 T.C. at 430, or that she prepared a business plan for the horse activity as it would pertain to the subject years.  While petitioner did retain some records on the horse activity, we do not find on the basis of credible evidence that she ever used those records or the data reflected therein to evaluate or improve that activity's financial performance.  See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Connolly v. Commissioner, T.C. Memo. 1994-218, affd. without published opinion sub nom. Redd v. Commissioner, 58 F.3d 635 (5th Cir. 1995).

Petitioner points the Court to a one-page fill-in-the-blanks form with seven headings (including one for the name of the business and another one for the year) that she alleges is a legitimate and sufficient business plan for the horse activity. We disagree with this assertion. This form on its face refers specifically to 1991, and we are unable to find that petitioner ever used this form to guide her in the horse activity as to any year, not even as to 1991. The claim of usefulness of the form as a business plan also suffers from the fact that (1) neither it nor petitioner's testimony specifies when it was prepared, (2) petitioner never filled in a line on the form that references the manner in which revenue in the activity may increase, although the activity in its 3 years of existence from 1988 through 1990 had generated minimal revenues and had experienced losses totaling almost $100,000, and (3) petitioner failed to conduct the horse activity consistently with lines on the form that were filled in. As to the latter, the form states that petitioner will (1) sell the Falling Water Way property, (2) start showing Silent Reign, (3) build on the Gavilan Hills property, and (4) "breed, show, sell". Petitioner has never done any of the first three enumerated items. Nor as to the fourth enumerated item has she consistently bred, shown, and/or sold her horses from 1991 to date. While petitioner did show two of her horses occasionally from 1992 to 2000, she did not show any of her

horses in 1991, the purported year of the plan. Moreover, while petitioner did breed one of her horses in 1991, she declined to breed any of them again until 1997. She also did not sell a horse for consideration until 2001.

Petitioner also relies erroneously on her assertion that respondent did not challenge her substantiation of the expenses reported on the subject returns. Respondent in the notice of deficiency did reflect such a challenge as to the amounts of those expenses that equaled the amounts of the reported losses.[16] The notice of deficiency states specifically as to those expenses that "it has not been established that the claimed expenses were incurred or, if incurred, paid by you during the taxable year for ordinary and necessary business purposes or that any claimed amount qualifies as an allowable deduction under the provisions of the Internal Revenue Code." Moreover, even if respondent had declined to make this challenge, it would not have meant as petitioner would have it that she kept and used books and records for the horse activity in a businesslike fashion. See Golanty v. Commissioner, supra at 430; Burger v. Commissioner, T.C. Memo. 1985-523; accord McKeever v. Commissioner, T.C. Memo. 2000-288 (taxpayers' ability to substantiate claimed expenses does not

---

[16] In other words, respondent for each of the subject years allowed petitioner to deduct her claimed expenses up to the amount of the gross income from the activity that she reported for that year.

necessarily mean that they kept or used books and records in a businesslike fashion); Steele v. Commissioner, T.C. Memo. 1983-63 (checks were not businesslike records although they sufficed to substantiate claimed expenses).  Although a taxpayer such as petitioner need not maintain a sophisticated cost accounting system for any or all of her purported business activities, she is expected to keep records that enable her to make informed business decisions as to the activity, see Burger v. Commissioner, 809 F.2d at 359, and otherwise allow her to cut expenses, increase profits, or evaluate the activity's overall performance, see Sullivan v. Commissioner, T.C. Memo. 1998-367, affd. without published opinion 202 F.3d 264 (5th Cir. 1999); Abbene v. Commissioner, T.C. Memo. 1998-330; Steele v. Commissioner, supra.  Petitioner presented no credible evidence that she used any record to implement cost-saving measures or to improve profitability.

B.   Conducting the Activity Similarly to Comparable Businesses Which Are Profitable

The fact that a taxpayer operates an activity similarly to a comparable business which is profitable indicates that the taxpayer had a profit objective as to the activity.

Petitioner did not conduct the horse activity similarly to the manner in which she understood that comparable businesses conducted their horse breeding activities.  As to other breeders, petitioner testified that most of them "just breed away".

Petitioner not only did not "just breed away"; she rarely bred her horses at all. The record indicates, and we find as a fact, that petitioner has bred only two of her seven horses that survived birth, the first in 1988 and the second only four times in approximately 14 years. Although petitioner attempted to rationalize the minimal breeding of her horses by testifying that she endeavored to breed her horses only with "national champions" in order to improve the value of the foals, she contradicted that testimony shortly after giving it by testifying that she aimed to breed her horses either with national champions or with simply "good horses". We do not find that all, or in fact any, of the horses which petitioner used to breed her mares were "national champions".

We also are unpersuaded by petitioner's assertion that her minimal breeding was due to her belief that the design of the Falling Water Way property allowed her to breed only one of her horses at a time. Although the Falling Water Way property has only four stalls in which to keep horses, petitioner acknowledges in her reply brief that horses can also be kept in the pens. We also note that even if the Falling Water Way property did limit petitioner's keeping of horses on the property to a maximum of six, an assumption that the record does not allow us to find as a fact, she has never owned six horses at one time and she has never kept more than three horses on the Falling Water Way

property.  Moreover, of the 5 horses that petitioner maintained during the subject years, one (Bogaz) was a gelding that she maintained for 10 years before selling it and another (Silent Reign) was a horse that she kept at the Falling Water Way property for more than 5 years after selling it.

C.  Changing Methods To Improve Profitability

A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods may also indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner alleges that she changed her method of operation for the better when she stopped breeding horses from 1992 through 1996 on account of a depressed market and started breeding them again in 1997 when she sensed that the market had improved.  We find no credible evidence to support petitioner's claim that the market for Arabian horses was depressed from 1992 through 1996 or that it changed favorably for her in 1997.  In addition, while petitioner testified that she was making her horses well known from 1992 through 1996 by showing them, she sold for consideration only one of her horses after that period and that was not until 5 years after the period ended.

Petitioner also alleges that she attempted to improve the horse activity's profitability by causing a reduction in the operating expenses of the horse activity for the 4-year period from 1997 through 2000, when compared to the 4-year period from

1993 through 1996.  We are unpersuaded by this allegation.  While the horse activity's operating expenses did in fact decrease during the second 4-year period, this decrease was not due to any special effort made by petitioner.  It was due primarily to a decrease during the latter 4-year period of the horse activity's boarding/training expenses.  From 1993 to 1996, petitioner began showing Kart Blanche and Bogaz more frequently than in prior years.  Given that these two horses were relatively young as of January 1, 1993, and that they had received minimal training beforehand, the need for them to train for the shows, and hence the training expenses, were naturally greater during the earlier 4-year period.[17]  As the horses were trained, their training expenses obviously declined.  Such a decline occurred naturally and did not result from any special effort by petitioner to change operating methods, adopt new techniques, or abandon unprofitable methods.[18]

---

[17] We note that petitioner deducted "training" expenses for 1988, then deducted "boarding and training" expenses for 1989 through 1996, and then deducted "training" expenses for 1997 through 2002.  We understand the deduction of "boarding/training" to include the cost of boarding the horse at the training facility as part of its training.

[18] In the same vein, we also reject petitioner's assertion that she personally learned to train horses from 1992 through 1996 and thus was able to reduce expenses by training her horses after 1996.  Petitioner's 1997 through 2002 Federal income tax returns claim deductions for training in the total amount of $17,276.

Petitioner also claims that she undertook to decrease the horse activity's operating expenses by learning in 1993 and 1994 to perform some basic veterinary services. Even assuming that petitioner learned to perform these services as claimed, an assumption that is not supported by the credible evidence in the record, such efforts did not effectively decrease the horse activity's veterinary expenses. Petitioner's tax returns from 1988 through 2002 show that the horse activity's veterinary expenses have remained fairly constant throughout all of the years of the horse activity's operation.[19]

D. Conclusion

We conclude on the basis of our analysis of the just-discussed three subfactors that petitioner did not carry on the horse activity in a businesslike manner. This factor favors respondent.

2. Petitioner's Expertise

A taxpayer's expertise, research, and study of the accepted business, economic, and scientific practices of an activity, as well as his or her consultation with experts, may be indicative of a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs.

---

[19] Nor are we persuaded that petitioner acted in a businesslike fashion by first leasing Borissa and buying it only after ascertaining that its foal was of "excellent" quality. We know little about this lease. Moreover, given that VT Kartel experienced medical complications beginning with its birth and died 9 months later, the facts at hand would appear to disprove petitioner's claim that VT Kartel was an "excellent" foal.

Petitioner asserts that she is a lifelong experienced businesswoman who before starting the horse activity read books, viewed videos, and consulted with experts consisting of her sister, her (petitioner's) daughter, a professional horse trainer, and an individual who bred and judged horses in Europe. Petitioner also asserts that she joined relevant trade associations in 1985 and that she was knowledgeable of some veterinarian services and the training and showing of horses. Petitioner concludes that this factor weighs in her favor. We disagree.

The mere fact that petitioner may have aspired to breed horses does not necessarily mean that she entered into the horse activity with the requisite profit objective. The credible evidence in the record does not establish that petitioner read or viewed the referenced materials or consulted with her so-called experts before entering into the horse activity in 1988. While petitioner testified generally that she did, she discredited that testimony by also testifying that these happenings were not until 3 years after she bought her first horse. She also did not specify or otherwise elaborate on the referenced books or videos, other than to say that they were breeding and training books and veterinarian manuals, or the advice that she purportedly received from the trainer, the breeder/judge, or her sister and daughter; e.g., was it general advice regarding showing and promoting

horses, did it include specific business advice on how to start and operate a horse breeding business profitably, did she follow the advice?  Nor is there credible evidence in the record that any of these purported experts were actually experts on anything related to the conduct of the business of breeding and showing horses (or even on the conduct of a business in general).  While petitioner did testify generally that her daughter is a certified public accountant, we know nothing else about her daughter's practice of public accounting (e.g., what is her specialty) or, more specifically, whether she is an expert on the subject of horse breeding and showing.  We also note as to this daughter that each of petitioner's 1988 through 2002 tax returns appears to have been prepared by someone else.

Of course, petitioner has over the years acquired some sort of hands-on experience on the subject of horse breeding from the point of view of a horse breeder.  The record, however, does not reflect that she has ever acquired any knowledge of the business or economic aspects of horse breeding so as to be prepared for the economic realities of a horse breeding and showing business. We find nothing credible to suggest that she prepared for the economic aspects of the activity by study or consultation with experts, nor has she shown that, before starting the activity, she had any idea of what her ultimate costs might be, how she might achieve any degree of cost efficiency, the amount of

revenue she could expect, or what risks might impair the production of these revenues. She also has not established that she undertook a basic investigation of the factors that affected the profitability of a horse breeding and showing activity. See Vallette v. Commissioner, T.C. Memo. 1996-285; Underwood v. Commissioner, T.C. Memo. 1989-625; see also McKeever v. Commissioner, T.C. Memo. 2000-288 (taxpayer's background as a lifelong horsewoman did not provide sufficient expertise as to the economic aspects of a horse pursuit to indicate a profit objective). As in Daley v. Commissioner, T.C. Memo. 1996-259, petitioner apparently started her horse activity with little concept of the expenses involved or of the steps required to achieve cost efficiency and an eventual profit and has continued to operate the activity in the same manner. See also Rinehart v. Commissioner, T.C. Memo. 1998-205. While a taxpayer need not prepare for an activity by making a formal market study, he or she should at least undertake a basic investigation of the factors that would affect profit. Underwood v. Commissioner, supra; Burger v. Commissioner, T.C. Memo. 1985-523.

This factor favors respondent.

## 3. Time and Effort Spent Conducting the Activity

The fact that a taxpayer devotes much of his or her personal time and effort to an activity may indicate a profit objective, especially where the activity does not involve substantial

personal or recreational aspects.  McKeever v. Commissioner, supra; Daley v. Commissioner, supra.  A taxpayer's withdrawal from another occupation to devote his or her time and effort to an activity also may indicate a profit objective.  Burleson v. Commissioner, T.C. Memo. 1983-570; sec. 1.183-2(b)(3), Income Tax Regs.

Petitioner asserts that she performs almost all of the work in the horse activity and that she spends 30 hours a week working in this activity.[20]  Petitioner concludes that this factor "clearly" weighs "heavily" in her favor.  We disagree.

First, petitioner presented no documentary evidence to support her claim that she spent 30 hours per week working on the horse activity, and we find that the referenced 30 hours includes all of the time that petitioner spent with her horses, including time that was personal or recreational to her.  We thus discount her testimony that 100 percent of the time that she spent with her horses was for business.  We also note that this testimony is somewhat incredible on its face.  Petitioner was deeply involved with horses before starting the horse activity in 1988, and she bought her first horse because she missed the pleasure of being with horses.  It is quite a stretch for her now to ask us to believe that her only involvement with horses since 1988 has been

---

[20] Although petitioner testified generally that she budgeted "at least" 30 hours a week to spend with her horses, she argues in her brief that she spent a flat 30 hours.

on a business basis.  Such is especially so given the fact that she repeatedly referred to her horses throughout her testimony as her "babies", even in the case when she was referring to one of her horses that was relatively old.[21]

Second, petitioner has never decreased the 36 hours per week that she works in her dental practice to devote more time to the horse activity, and she has never increased the 30 hours per week that she spends with her horses.[22]  The dental practice is an established business, and petitioner claims that the horse activity is a business in its startup phase.  By her own admission, however, she works fewer hours per week in her self-described startup business than she does in her established business.  Given her claim and our finding that she spends time in the horse activity on each day of the week, it also appears that she spends on each of the days that she is not working as a dentist less time in the horse activity than the average 9 hours per day that she works as a dentist.[23]  We recognize that 30

---

[21] Feyras Raehele, Kart Blanche, and Borissa were 24, 24, and 21 years old, respectively, in the year of petitioner's trial.

[22] Although petitioner did take some time off from her dental practice, we find no credible evidence in the record from which to conclude that any of this time that she spent in the horse activity was an increase to her regular 30 hours per week.

[23] In other words, if petitioner had devoted 9 hours a day to the horse activity on each of the 3 days every week that she did not work as a dentist, she would have spent on those 3 days

(continued...)

hours a week is a considerable amount of time to spend on an activity, especially for an individual such as petitioner who works professionally 36 hours a week and who performs most of the tasks of the horse activity which may be viewed as mundane and not recreational; e.g., feeding, washing, and worming the horses. Such time and apparently mundane tasks, however, are just as much a part of a horse breeding and showing hobby as they are of a horse breeding and showing business.

This factor favors respondent.

4. Expectation That Assets Will Appreciate in Value

A taxpayer's expectation that assets such as land and other tangible property used in an activity may appreciate in value to create an overall profit may indicate that the taxpayer has a profit objective as to that activity. Sec. 1.183-2(b)(4), Income Tax Regs. An overall profit is present if net earnings and appreciation are enough to recoup losses sustained in prior years. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Petitioner argues that this factor profoundly supports her position. According to petitioner, the appreciation in the value of the horses, land, and other property used in the horse

---

[23](...continued)
27 of the 30 hours that she devoted to the horse activity. This leaves only a total of 3 hours to be attributed to the other 4 days of the week.

activity exceeds the sum of the taxable losses incurred in the activity. We disagree. With the possible exception of evidence establishing that Bogaz was bred by petitioner and then sold by her 10 years later for $20,000, petitioner has presented no credible evidence that any of the assets used in the horse activity (or for that matter any property that she owns) has appreciated in value.[24] Nor does the record contain any credible evidence as to the specific fair market value of any of her assets (but for Bogaz). While petitioner asks the Court to find that the fair market values of Borissa, Feyras Raehele, Kart Blanche, and the Falling Water Way property are the amounts which the parties stipulated that the fair market values of those assets were "not more than", we decline to do so.[25] The fact that the value of an asset is "not more than" a stipulated amount does not mean that it is equal to that amount or, for that matter, that it is even close to that amount.

Petitioner focuses especially on the Gavilan Hills property and states that this property supports her claim of a profit

---

[24] In fact, petitioner's reporting that she received no consideration on her sale of Silent Reign would indicate that Silent Reign had lost all of its $3,500 value during the time that she owned it.

[25] We also decline petitioner's invitation to consider the values reported on her depreciation schedules as the fair market values of those depreciable assets at any time and decline to presume that the fair market value of VT Kartel, had it not died, would have as of the time of her trial been greater than her proffered $35,000 fair market value of Kart Blanche.

objective. We disagree. Petitioner purchased the Gavilan Hills property aspiring to sell the Falling Water Way property, build and move her residence on and to the Gavilan Hills property, and design the Gavilan Hills property so that she could continue her horse activity and possibly expand that activity to include the boarding of horses. She conceded through her testimony, however, that she abandoned this aspiration incident to her purchase of the Gavilan Hills property. As to the fact that she sometimes rode her horses on the Gavilan Hills property, we do not believe that this action, which we view to be more pleasure than business, serves to characterize that property as a business asset. Nor do we believe that the Gavilan Hills property is properly construed as an asset of the horse activity merely because petitioner envisioned that she could someday sell it and invest the proceeds in the development of a new location for the horse activity or the start of a new horse boarding activity.

This factor favors respondent.

5. Taxpayer's Success in Similar or Dissimilar Activities

Although an activity is unprofitable, the fact that a taxpayer has previously converted comparable activities from unprofitable to profitable enterprises may show a profit objective. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioner notes that she successfully established her dental practice and argues that this factor weighs in her favor.

We disagree.  Although petitioner has been a successful entrepreneur in the dental profession, the record does not reveal that her work in that profession had any bearing on her ability to conduct the horse activity profitably.  See Haladay v. Commissioner, T.C. Memo. 1990-45 ("wholesale sporting goods business is sufficiently dissimilar from farming that even if * * * [the taxpayer's] business had been a consistently profitable one, a conclusion that the farming activity should have been equally profitable would not be warranted."); see also Dodge v. Commissioner, T.C. Memo. 1998-89 (taxpayers, who had business expertise, failed to show that such expertise was used in their horse activity), affd. without published opinion 188 F.3d 507 (6th Cir. 1999).  Moreover, the record does not establish that she conducted her horse activity in a businesslike manner similar to that of her dental practice.

This factor favors respondent.

## 6.  Activity's History of Income and/or Losses

The fact that a taxpayer incurs a series of losses beyond an activity's startup stage may indicate the absence of a profit objective as to that activity unless the losses can be blamed on unforeseen or fortuitous circumstances beyond the taxpayer's control.  Sec. 1.183-2(b)(6), Income Tax Regs.; cf. Golanty v. Commissioner, 72 T.C. at 427 (horse breeding activity may be engaged in for profit despite consistent losses during the

startup phase). We previously have found that the startup phase for an Arabian horse breeding business may be between 5 and 10 years. See Engdahl v. Commissioner, 72 T.C. at 669; see also Phillips v. Commissioner, T.C. Memo. 1997-128 ("a period of 5 to 10 years for the startup phase of an Arabian breeding operation is not unreasonable").

Petitioner argues that this factor weighs in her favor. According to petitioner, she has suffered numerous setbacks in her horse activity including a depressed market in the Arabian horse industry from 1992 to 1996, lack of space, a drop in the value of her home, which she planned to sell to raise capital to develop the Gavilan Hills property, stillborn foals, and mares not conceiving. Taking into account these setbacks, petitioner states, she was still in the startup phase of the horse activity during the subject years. Petitioner also states that her losses from the horse activity have diminished over the years.

We disagree with petitioner that this factor weighs in her favor. First, as noted above, we find no credible evidence in the record to support petitioner's claim of a depressed market from 1992 to 1996, a drop in the value of her home, or the failure of bred mares to conceive. Nor do we believe that the financial results of the horse activity are attributable to petitioner's claim of lack of space or the stillborn foal. The horse activity has lost money in every year of its operation,

except for 2001 when it reported a small profit of $209 on account of the sale of Bogaz. As to its entire existence though 2002, the horse activity reported gross income totaling $42,291, expenses totaling $459,950, and net losses totaling $417,659.[26] The magnitude of the horse activity's losses in comparison to its gross income is an indication that petitioner lacked a profit objective as to that activity. See Burger v. Commissioner, 809 F.2d at 359; Dodge v. Commissioner, T.C. Memo. 1998-89.

Such an indication is especially glaring given that none of petitioner's explanations for her history of losses adequately explains the magnitude and duration of those losses and that the record does not include any credible evidence to suggest that petitioner ever expected to recoup any of those losses. The fact that the horse activity suffered losses year after year and that petitioner took no meaningful action to reverse the tide supports a finding that she was indifferent as to whether the losing trend could be reversed. Ranciato v. Commissioner, 52 F.3d 23, 25-26 (2d Cir. 1995), vacating T.C. Memo. 1993-536.

This factor favors respondent.

7. Amounts of Occasional Profits

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of

---

[26] Petitioner also admitted at trial that she was most likely going to report a net loss for 2003.

the assets in use may indicate a profit objective. See sec. 1.183-2(b)(7), Income Tax Regs. Absent actual profits, the opportunity to earn substantial profits in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit. See id.; see also Dawson v. Commissioner, T.C. Memo. 1996-417 (taxpayer's belief that a champion horse could generate a substantial amount of revenue and correspondingly large profits may be probative of a profit objective).

Petitioner speculates that an Arabian stallion could earn substantial income through stud/breeding fees or syndication. Thus, petitioner concludes, the possibility of earning a large ultimate profit in the horse activity justifies her pursuit. Petitioner notes that she recognized a profit in 2001 by selling a "home-bred gelding" and states that the asset value of her activity also has appreciated over the course of its operation.

Petitioner argues that this factor favors her. We disagree. First, petitioner acknowledges in her brief that the record lacks evidence concerning the number of mares that a stallion can breed each year and the syndicated values of purebred Arabian stallions. While she asks the Court to draw a "logical inference that Arabian stallions could earn substantial income, and/or be syndicated (have ownership divided) for profit potential of a

quite substantial nature", we decline to draw such an inference on the basis of the record at hand.

Second, the horse activity has incurred 15 years of large losses and only had a profit, minimal at that, in a single year. Petitioner has not persuaded us that the horse activity has a chance either to make a profit in the future or to recoup the losses which it has incurred to date. She acknowledged during her testimony that showing horses is not a viable way to earn income, and her advertising expenses for the horse activity have been minimal. She also has shown Kart Blanche since 1990, but has never offered it for sale, and sold Bogaz 9 years after first showing it. While she claims that the horse activity may someday earn a speculative profit from stud/breeding fees or syndication of an Arabian stallion, this claim is not supported by the record before us. Nor is this claim sufficient in this case to outweigh the absence of any meaningful profit in any year of the horse activity's operation (or for that matter any profit at all except for the year of the sale of Bogaz). Although petitioner testified that the nonoccurrence of certain events would have resulted in her reporting a profit for some of the years of the horse activity's operation, we are unpersuaded that such would have been the case.

This factor favors respondent.

8. Taxpayer's Financial Status

The fact that a taxpayer does not have substantial income or capital from sources other than an activity may indicate that the activity is engaged in for profit. See sec. 1.183-2(b)(8), Income Tax Regs. The fact that a taxpayer does have substantial income from sources other than an activity, on the other hand, may indicate that the activity is not engaged in for profit. The latter is especially true where losses from the activity generate substantial tax benefits or where there are personal or recreational elements involved. Sec. 1.183-2(b)(9), Income Tax Regs.

Petitioner asserts that she is an upper middle class individual who has invested a substantial portion of her income in the horse activity for the purpose of securing a source of retirement income and that the amount of this investment is inconsistent with the pursuit of a hobby. Petitioner concludes that this factor weighs in her favor. We disagree. Petitioner had a steady and substantial stream of cash/income from activities other than the horse activity; e.g., her work as a dentist and her leasing of property to Giles Inc. Her financial status allowed her to participate in the horse activity, an otherwise expensive recreational activity that allowed her to enjoy her lifelong pleasure of interacting with horses, while at the same time receiving a subsidy for this activity from the

fisc; i.e., petitioner used her reported losses from the horse activity to reduce significantly her taxable income in every year but one, which in turn reduced her income tax liability for those years. Contrary to petitioner's assertion, we do not believe that she engaged in the horse activity to obtain a source of retirement income. In addition to the fact that she has an IRA, she owns valuable assets in the form of the Gavilan Hills property, her established dental practice, and the land and building on and in which her dental practice is located.

This factor favors respondent.

9. Elements of Personal Pleasure

The presence of personal pleasure or recreation from an activity may indicate the absence of a profit objective. See id. The mere fact that a taxpayer derives personal pleasure from an activity, however, does not necessarily mean that he or she lacks a profit objective with respect thereto. A profit objective may be present in the latter case if the activity is truly engaged in for profit as evidenced by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Petitioner asserts that the horse activity is neither recreational nor pleasurable to her because (1) she devotes 30 hours per week to the mundane jobs of feeding, maintaining, grooming, and training her horses and (2) she never rides her horses recreationally. Petitioner concludes that this factor

overwhelmingly weighs in her favor.  We disagree.[27]  First, as
noted above, we find from a factual point of view that petitioner
rides her horses recreationally and that the 30 hours per week
that she spends with her horses includes this recreational time.
Thus, even if we were to agree with petitioner that her
referenced jobs were all "mundane", we would not agree that all
of her time was spent performing these jobs.  See also Dodge v.
Commissioner, T.C. Memo. 1998-89 (substantial time that the
taxpayers spent in their horse breeding activity did not indicate
a profit objective because the taxpayers, who were skilled
riders, derived recreational benefit from the time they spent
with their horses); Ballich v. Commissioner, T.C. Memo. 1978-497
(substantial time that the taxpayers spent on breeding and
showing their dogs indicated that the activity was a "labor of
love" rather than an undertaking to derive profit).

Second, contrary to petitioner's claim, the record shows
that during the subject years she did not perform all of the work
in the horse activity.  Petitioner deducted for those respective
years expenses of (1) $1,330 and $714 for outside services,
(2) $1,518 and $1,645 for training, (3) $1,382 and $1,453 for

---

[27] We note at the start that we disagree with petitioner's
statements in brief that a finding of personal pleasure requires
that we find evidence of parties at the Falling Water Way
property or social activities involving her horses.

veterinary services, and 4) $2,135 and $2,450 for farrier (blacksmith) services.

We also believe that it is evident that petitioner gains personal pleasure from the horse activity. She testified that she was compelled to buy her first horse because she had been away from horses for awhile. She also admittedly rode her horses during the relevant years in the wilds of the undeveloped (and most likely scenic) 11.53 acres of the Gavilan Hills property. To our minds, such riding on that property was more conducive to pleasure than to pure training, the latter of which most likely could have been done in the arena that petitioner had purchased (or built) approximately 1 year before purchasing the Gavilan Hills property. We also note that petitioner throughout her testimony repeatedly referred to her horses as her "babies" and opted not to dispose of her "babies" even when they were aged, unable to breed, expensive to maintain, and/or unprofitable.[28]

This factor favors respondent.

10. Additional Factor

Petitioner did not on any of her 1988 through 2002 Schedules C deduct interest or taxes paid as to the Falling Water Way property and the Gavilan Hills property. We consider this fact

---

[28] For example, she has kept Feyras Raehele at the Falling Water Way property but has not bred it since 1988, and she has kept Silent Reign at that property even though she sold it to her daughter in 1997.

to indicate that petitioner did not intend that either of those properties be considered part of the horse activity.

11.  Conclusion

We conclude that petitioner did not engage in the horse activity during the subject years with a predominant, primary, or principal profit objective.  We reach this conclusion having considered the aforementioned 10 factors, all contentions presented by the parties, and the unique facts and circumstances of this case.  All arguments made by petitioner but not discussed herein are without merit.

Decision will be entered

for respondent.

APPENDIX

| | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross income | 95 | 3,508 | 224 | 0 | 3,000 | 3,200 | 4,080 | 2,500 | 3,024 | 260 | 500 | 900 | 1,000 | 20,000 | 0 | 42,291 |
| Advertising | 742 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,837 | 25 | 0 | 0 | 0 | 0 | 0 | 2,604 |
| Car & truck | 1,715 | 0 | 154 | 102 | 0 | 271 | 0 | 35 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,277 |
| Parking | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 |
| Trailering | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,386 | 0 | 497 | 0 | 0 | 0 | 0 | 1,883 |
| Trailer space | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 390 | 105 | 204 | 225 | 0 | 924 |
| Dues/subscriptions | 50 | 150 | 135 | 245 | 65 | 190 | 876 | 60 | 155 | 303 | 502 | 230 | 207 | 185 | 609 | 3,962 |
| Freight | 50 | 0 | 125 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 175 |
| Costumes | 0 | 0 | 770 | 47 | 63 | 2,233 | 1,033 | 553 | 1,018 | 384 | 0 | 0 | 0 | 0 | 0 | 6,101 |
| Nonhealth insurance | 170 | 336 | 0 | 0 | 45 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 618 |
| Mort. interest | 0 | 655 | 832 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,487 |
| Nonmort. interest | 2,113 | 3,838 | 2,983 | 1,844 | 1,013 | 62 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11,853 |
| Repairs & maint. | 0 | 0 | 0 | 0 | 0 | 0 | 2,666 | 1,379 | 75 | 992 | 0 | 353 | 685 | 0 | 435 | 6,585 |
| Blkt., laun. & rep. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 66 | 0 | 0 | 0 | 0 | 106 |
| Vehicles/M&E rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 520 | 335 | 870 | 0 | 0 | 0 | 0 | 0 | 1,725 |
| Other prop. rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,025 | 624 | 0 | 0 | 0 | 418 | 2,067 |
| Taxes & licenses | 0 | 0 | 0 | 0 | 0 | 0 | 376 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 623 | 999 |
| Legal/prof. serv. | 0 | 150 | 0 | 0 | 0 | 0 | 895 | 0 | 350 | 0 | 0 | 0 | 0 | 0 | 0 | 1,395 |
| Supplies | 896 | 0 | 0 | 0 | 0 | 0 | 0 | 4,357 | 1,649 | 4,011 | 6,287 | 6,014 | 3,264 | 3,157 | 3,853 | 33,488 |
| Travel | 332 | 0 | 1,937 | 140 | 303 | 2,898 | 538 | 444 | 2,396 | 0 | 0 | 0 | 0 | 0 | 469 | 9,457 |
| Ded. meals/enter. | 0 | 0 | 0 | 0 | 0 | 271 | 75 | 96 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 442 |
| Board & care | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 200 |
| Boarding/training | 0 | 2,862 | 6,099 | 3,170 | 10,236 | 16,996 | 11,581 | 8,195 | 7,380 | 0 | 0 | 0 | 0 | 0 | 0 | 66,519 |
| Training | 5,054 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,518 | 1,645 | 3,388 | 4,135 | 4,315 | 2,275 | 22,330 |
| Care provider | 0 | 0 | 0 | 0 | 0 | 0 | 505 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 505 |
| Breeding fees | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,250 | 0 | 0 | 0 | 0 | 0 | 8,250 |
| Feed | 1,240 | 3,144 | 4,063 | 4,541 | 2,341 | 3,308 | 0 | 0 | 0 | 0 | 1,764 | 3,319 | 2,129 | 3,302 | 3,482 | 32,633 |
| Feed & bedding | 0 | 0 | 0 | 0 | 0 | 0 | 3,454 | 3,348 | 2,524 | 3,606 | 0 | 0 | 0 | 0 | 0 | 12,932 |
| Shavings | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 808 | 993 | 1,801 |
| Registration fees | 0 | 78 | 176 | 1,959 | 2,478 | 5,147 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150 | 0 | 9,988 |
| Entry fees | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 5,669 | 6,269 | 1,221 | 0 | 0 | 0 | 2,182 | 1,646 | 17,147 |
| Cleaning & maint. | 0 | 60 | 462 | 490 | 460 | 1,473 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,945 |
| Tailoring & Mater. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 528 | 91 | 0 | 0 | 619 |
| Mare lease fee | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 |
| Shoeing | 0 | 605 | 615 | 510 | 1,314 | 1,650 | 965 | 1,909 | 2,715 | 0 | 0 | 0 | 0 | 0 | 0 | 10,283 |
| Farrier | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,135 | 2,450 | 2,317 | 2,576 | 2,446 | 2,655 | 14,579 |
| Fly control | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 288 | 0 | 0 | 0 | 160 | 0 | 448 |
| Futurity/sweepstakes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,576 | 0 | 0 | 0 | 115 | 0 | 1,691 |
| Horse lodging | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 295 | 0 | 0 | 0 | 0 | 0 | 295 |
| Shipping | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 250 | 0 | 0 | 0 | 250 |
| Awards program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 95 | 95 |
| Show fees | 1,623 | 723 | 2,185 | 822 | 653 | 349 | 2,909 | 5,719 | 5,377 | 115 | 5,144 | 2,364 | 3,127 | 346 | 2,174 | 33,630 |
| Photography | 0 | 0 | 0 | 0 | 0 | 0 | 360 | 169 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 529 |
| Tack supplies | 0 | 1,803 | 2,482 | 2,542 | 1,623 | 3,790 | 1,920 | 1,038 | 3,379 | 0 | 0 | 0 | 0 | 0 | 0 | 18,577 |
| Vet. services | 222 | 1,304 | 3,410 | 1,803 | 2,434 | 899 | 5,322 | 2,377 | 1,272 | 1,382 | 1,453 | 2,614 | 1,731 | 947 | 3,101 | 30,271 |
| Vet. supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,518 | 2,518 |
| Licenses | 154 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 154 |
| Promotion | 0 | 34 | 135 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 169 |
| Outside services | 0 | 0 | 0 | 0 | 0 | 0 | 125 | 2,103 | 1,160 | 1,330 | 714 | 2,195 | 0 | 170 | 370 | 8,167 |
| Misc. | 1,026 | 1,515 | 29 | 60 | 524 | 0 | 285 | 343 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,782 |
| Operating exp. | 20,587 | 18,257 | 26,592 | 18,275 | 23,552 | 39,577 | 34,120 | 38,314 | 39,277 | 24,366 | 21,536 | 23,677 | 18,149 | 18,508 | 25,743 | 390,530 |
| Deprec. | 7,195 | 13,987 | 11,605 | 9,861 | 8,993 | 7,045 | 4,032 | 2,389 | 1,060 | 109 | 32 | 0 | 500 | 1,283 | 1,329 | 69,420 |
| Total exp. | 27,782 | 32,244 | 38,197 | 28,136 | 32,545 | 46,622 | 38,152 | 40,703 | 40,337 | 24,475 | 21,568 | 23,677 | 18,649 | 19,791 | 27,072 | 459,950 |
| Net inc. (loss) | (27,687) | (28,736) | (37,973) | (28,136) | (29,545) | (43,422) | (34,072) | (38,203) | (37,313) | (24,215) | (21,068) | (22,777) | (17,649) | 209 | (27,072) | (417,659) |