T.C. Memo. 2013-221

UNITED STATES TAX COURT

ZAVRA D. RODRIGUEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ANDREA M. RODRIGUEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5093-11, 5094-11.　　　　Filed September 18, 2013.

<u>Anthony V. Diosdi</u>, for petitioners.

<u>Timothy A. Froehle</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  In separate notices of deficiency, respondent determined deficiencies in petitioners' Federal income tax and related accuracy-related penalties for 2007 as follows:

| [*2] Petitioner | Deficiency | Accuracy-related penalty sec. 6662 |
|---|---|---|
| Andrea M. Rodriguez | $24,701 | $4,940 |
| Zavra D. Rodriguez | 22,228 | 4,445 |

Petitioners, while residing in California, petitioned this Court for a redetermination of their deficiencies and penalties. The parties were able to resolve a number of issues reflected in the stipulation of settled issues filed October 23, 2012. We decide two remaining issues: (1) whether petitioners' horse-breeding activity was "an activity not engaged in for profit" within the meaning of section 183[1] for 2007. We hold it was; and (2) whether petitioners are liable for the accuracy-related penalties under section 6662(a). We hold they are not.

FINDINGS OF FACT

The parties' stipulation of facts with accompanying exhibits, their supplemental stipulation of facts with accompanying exhibits to the extent admitted during trial, and the stipulation of settled issues are incorporated herein by this reference. We find the facts accordingly.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] I.      Petitioners' wage income history

Andrea has been employed by the State of California as a "state investigator" since at least 1993. Between 1993 and 2000, Andrea and her then husband, José Rodriguez, filed a joint Federal income tax return for each year and reported a combined annual income, including wages, ranging from $78,000 to $108,000. After their divorce, Andrea reported her annual income, including wages, ranging from $48,000 to $71,000 for years 2001 through 2009; except that in 2007, the year at issue, Andrea had $69,977 additional income from a distribution from pensions and annuities.

Zavra, Andrea's daughter, began filing Federal income tax returns in 2002. Zavra reported annual wage income ranging from $22,000 to $35,000, except in 2007 when she also received a distribution from pensions and annuities of $69,977 (the same amount Andrea received in the same year).

II.     Petitioners' horse-breeding activity

A.      History of income and losses from the horse-breeding activity

1.      Queensland's losses

Andrea and her then husband José began their horse-breeding activity, Queensland Horse Farm (Queensland), in 1993, which petitioners have conducted at all relevant times at a 40-acre farming property in Farmington, California

**[\*4]** (Farmington property).[2]  From its inception through 2009, the horse-breeding activity never turned a profit and in fact incurred more than $1.8 million of losses reported on Schedule F, Profit or Loss From Farming.  Between 2002[3] and 2008, Andrea and Zavra each claimed half of the deductions for the annual losses resulting from the activity.  With the losses, petitioners were able to offset all of their income during the period between 1993 and 2008 and incur zero tax liability as shown in the following table:[4]

---

[2]Andrea and José purchased the Farmington property in 1989.  When they purchased the Farmington property, the property also included a residence where petitioners have lived since.

[3]Zavra became Andrea's partner in the horse-breeding activity in 2002. See infra.  The record does not show that Zavra filed a Federal income tax return before 2002.

[4]In 2009 Zavra left the partnership and did not claim any loss deduction from the horse-breeding activity.  As a result, Zavra had a tax liability of $11,829 on her $31,129 wage income from 2009.

[*5]

| Year[1] | Andrea's Income & wages (excluding Schedule F income) | Schedule F income or (loss) | Taxable income (after deductions) | Zavra's Income & wages (excluding Schedule F income) | Schedule F income or (loss) | Taxable income (after deductions) |
|---|---|---|---|---|---|---|
| 1993 | $77,664 | ($113,988) | -0- | --- | --- | --- |
| 1994 | 83,495 | (57,321) | -0- | --- | --- | --- |
| 1995 | --- | --- | --- | --- | --- | --- |
| 1996 | --- | --- | --- | --- | --- | --- |
| 1997 | --- | --- | --- | --- | --- | --- |
| 1998 | --- | --- | --- | --- | --- | --- |
| 1999 | 105,468 | (145,699) | -0- | --- | --- | --- |
| 2000 | 107,947 | (156,149) | -0- | --- | --- | --- |
| 2001 | 57,487 | (135,370) | -0- | --- | --- | --- |
| 2002 | 58,505 | (81,565) | -0- | 21,503 | (81,565) | -0- |
| 2003 | 70,790 | (59,924) | -0- | 26,162 | (59,924) | -0- |
| 2004 | 67,798 | (49,877) | -0- | 33,401 | (49,877) | -0- |
| 2005 | 67,635 | (58,118) | -0- | 33,131 | (58,118) | -0- |
| 2006 | 50,158 | (83,165) | -0- | 34,738 | (83,165) | -0- |
| 2007 | 121,876 | (105,424) | -0- | 104,607 | (105,424) | -0- |
| 2008 | 53,198 | (97,662) | -0- | 34,377 | (97,662) | -0- |
| 2009 | 47,735 | (128,452) | -0- | 31,129 | -0- | 11,829 |
| Total | 969,756 | (1,272,714) | -0- | 319,048 | (535,735) | 11,829 |

[1]Andrea and José's Federal income tax returns for years 1995 through 1998 are not part of the record.

2.    Queensland's income

Queensland's income stream over the years was dismal and sporadic; it totaled approximately $15,000 between 1993 and 2009.  During the five-year

[*6] period between 2004 and 2008, Queensland generated zero Schedule F income. The following table shows Queensland's history of farm income:

| Year | Schedule F income from Queensland |
|------|------------------------------------|
| 1993 | $750 |
| 1994 | 775 |
| 1995 | --- |
| 1996 | --- |
| 1997 | --- |
| 1998 | --- |
| 1999 | -0- |
| 2000 | -0- |
| 2001 | 2,250 |
| 2002 | 5,000 |
| 2003 | 6,000 |
| 2004 | -0- |
| 2005 | -0- |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | 346 |
| Total | 15,121 |

**[*7]** B.   Petitioners' research and expertise relating to the horse-breeding activity

1.   Andrea

Andrea started riding horses at the age of three and received formal instruction when she was in high school and college.  As she traveled the world and became familiar with different types of horses, Andrea became fascinated with warmbloods, which are horse breeds primarily from countries where riding is an older discipline than it is in the United States.  Andrea particularly enjoyed riding Swedish warmbloods described as medium-sized warmbloods that are known to be sport horses and performance horses.

In 1990 Andrea took a class in dressage where she learned dressage exercises and techniques.  Dressage is an equestrian sport that emphasizes controlled athletic movements of a horse and requires the horse to spend years to become athletically fit enough to perform certain routines; it is very similar to gymnastics or ballet for humans.  There are certain breeds of horses that are more successful in this discipline because of the desirable phenotype that is malleable to controlled movements.  The medium-sized Swedish warmblood is an ideal breed for this type of riding.

[*8]    Before Queensland's inception, Andrea already focused her research on breeding Swedish warmbloods.  She became a member of the Swedish Warmblood Association (SWA), which periodically dispatched inspection teams from Sweden to the United States to grade and evaluate horses presented at inspection events.  Even though she did not own any horses at the time, Andrea would attend the inspections to learn about SWA's criteria of grading horses.  Andrea also wanted to see the horses in performances and study the overall phenotype that SWA's breeding program tried to achieve.  In 1989 Andrea also became a member of the California Dressage Society, which sought to promote dressage in California through performances, competitions, and clinics.

In addition, Andrea contacted almost all Swedish warmblood breeders in the United States and Canada and a great number of them in Sweden for purposes of seeking expert advice on breeding Swedish warmbloods.  For example, Andrea contacted Jan Phillipson, the president of ASVH, which is the Swedish warmblood state association and registry, to seek marketing advice as well as advice on the suitability of Swedish warmbloods for sport performances and competitions.

In the early 1990s petitioners also met with Helen Dilworth on multiple occasions.  Ms. Dilworth at the time had owned and operated Trilogy Farm, a horse-breeding farm and business in Santa Cruz, for five years.  During their

[*9] meetings, petitioners would ask Ms. Dilworth general questions about her approach to breeding Swedish warmbloods, evaluating foals, and marketing and valuing horses. But Ms. Dilworth did not provide advice specific to petitioners' own operation or business plan. While Ms. Dilworth believes that she breeds good horses, she also acknowledges that "there are very few people in the world right now that are making any money breeding horses." There has been little contact between petitioners and Ms. Dilworth in the past 10 years.

Besides contacting those familiar with breeding Swedish warmbloods, Andrea also went to the Small Business Administration (SBA) in San Francisco ostensibly to obtain business advice from their SCORE Program. SCORE consists of a group of retired executives who offer mentoring services to small businesses. In connection with obtaining business advice from SCORE, Andrea submitted a business plan in 1993 (1993 business plan) that contained only general information. See infra. The plan mainly discussed breeding of horses. After Andrea submitted the business plan, she talked to an individual from SCORE about the plan, but the person had no knowledge about horses, had never been part of any horse business, and was not acquainted with anybody who had horses or a horse business. The record is devoid of details regarding the content of any

[*10] business advice Andrea might have received from the individual through this consultation.

2.      Zavra

Zavra began taking riding lessons when she was a child.  She has always enjoyed being around horses as they have always been a part of her life, so much so that at one point she dreamed of becoming a horse veterinary physician.  As early as 1985 when Zavra was 12, she already began studying about horses.

Between 1991 and 1993 she attended University of California in Davis (UC Davis) sporadically for two years and took classes in agricultural sciences and animal husbandry.  She also took classes in horse breeding, artificial insemination, and general management and care.  Zavra had an internship at UC Davis on horse breeding as well as internships with local veterinarians.  In addition, she took classes in the Swedish language while at UC Davis with the idea that she could later communicate with breeders in Sweden.

Around the same time, Zavra started to focus her research on breeding Swedish warmbloods.  She contacted associations in Sweden and reviewed competition results.  Zavra believed on the basis of her research that Swedish warmbloods were more marketable and more suitable for sport performances and competitions.  In 1993 Zavra traveled to Sweden, met with breeders there to find

**[*11]** the best horses, and brought back with her about five horses from Sweden.

In 1996 she arranged the purchase and shipping of horse semen from Sweden.

>    C.    The manner in which petitioners carried on the horse-breeding activity

>        1.    Business plan

Andrea allegedly devised a business plan for her horse-breeding activity as early as 1981 and submitted it to the SBA in San Francisco for feedback.  The 1993 business plan submitted to the SBA was a revision of this original business plan and, according to petitioners, was updated several times following the initial submission to the SBA.  The initial submission from 1993 is the only business plan in evidence.  The record does not show when the last time petitioners revised or revisited their business plan was.

The 1993 business plan contains five paragraphs of general description of the horse-breeding activity.  It provides mainly information on breeding and training Swedish warmbloods.  It states that Queensland is geared toward "the serious upper-level horse rider[s] * * * who are able to invest a great deal of time, effort, and money into their sport."  It continues to state that "the initial investment of purchasing a horse is the least costly aspect of Dressage and Jumping.  The daily care and upkeep for a horse is actually the greater expense."  It claims that

[*12] Queensland would require a large upfront investment, including startup costs, and any return on the investment would be delayed until the horses become marketable. According to the 1993 business plan, the startup cost for Queensland would be roughly $560,000.

The 1993 business plan essentially acknowledges that the purchasing of a horse constitutes only a small part of the overall longterm investment in owning and training a Swedish warmblood for sport, and the greater expense would be the daily care and upkeep. It thus appears that the longer petitioners held on to a horse, the more the potential profit from that horse would diminish in part because of the substantial overhead expenses. But the business plan fails to identify any considerations that may affect how petitioners could maximize profits from their horses.

The 1993 business plan also fails to articulate specific business requirements for the activity or provide the activity's financials. For example, the business plan does not have an operating costs projection, a multiyear profit and loss (P&L) projection, a balance sheet, or a cashflow statement often found in many business plans.

**[*13]**          2.          Advertising

By 2007 petitioners had placed no more than a handful of advertisements in various trade magazines and publications to list some of their horses for sale. They had also advertised the selling of semen of their stallions. However, there is no evidence that these advertisements generated any actual sales or were successful in reaching any potential buyers. There is nothing in the record suggesting petitioners have examined the effectiveness of their advertising efforts.

          3.          Budgeting

At least before 1999, Andrea and José, and possibly Zavra as well, used an accounting software to track expenses and a special horse-breeding software to track their inventory. Andrea would keep track of daily expenditures on index cards, and someone would then enter the information into the accounting software. Petitioners maintained a separate checking account for Queensland but only between 1993 and 1999.

Although petitioners kept track of Queensland's expenses and inventory, they never personally prepared any financial statements to scrutinize the activity's P&L, assets and liabilities, or cashflow despite the fact that the information needed to run the financials was, according to Andrea, readily available through the accounting software. Nonetheless, petitioners allegedly made rough financial

[*14] projections annually to determine the amount of income necessary to recover expenses incurred in the previous years and to generate a profit. Clearly, any financial projections that petitioners might have made had very little impact on the business decisions relating to Queensland since the activity continued to lose money every year and, as we will discuss below, petitioners did very little to turn the tide.

### 4. Insurance coverage

Petitioners did not have any insurance coverage for their horse-breeding activity and did not receive any insurance proceeds for a casualty loss relating to the activity as a result of a fire in 1999 (1999 fire). However, Andrea and her then husband had an insurance policy underwritten by Farmers Insurance Group to cover their personal property on the Farmington property and received insurance proceeds of $165,485 covering personal property lost in the 1999 fire.

### 5. Financing the horse-breeding activity

To finance the horse-breeding activity, both Andrea and Zavra used their wage income to pay the activity's expenses. Andrea also used life insurance proceeds of $242,000 that she received in 2006 and the $100,000 of proceeds of a 2005 home equity loan secured by the Farmington property to pay Queensland's expenses.

[*15] Queensland did not have any outside investors, and the record does not show petitioners had secured a commercial loan from a third-party lender to finance the horse-breeding activity.

D.     Assets used in the horse-breeding activity

1.     The horses

Petitioners' horse-breeding activity initially encompassed only the selling of the horses that they bred. In 2007 Queensland had 29 horses. Since inception, petitioners have sold 7 horses as follows:

| Horse | Year sold | Price |
| --- | --- | --- |
| Sabella | 1997 | $6,500 |
| Gwenna | 2001 | 2,250 |
| Garrisson | 2002 | 5,000 |
| Cassanova | 2003 | 2,500 |
| L'Irco | 2003 | 1,500 |
| Ikebano | 2003 | 1,500 |
| Lamira | 2010 | 5,000 |

Lamira was an example of a diploma mare--that is, she was inspected and found to be a horse of high quality--and was sold for $5,000 in 2010, among the highest selling prices in Queensland's history. But the journey she traveled to her eventual sale was a costly one. Andrea bought Lamira for approximately $15,000

[*16] in 1993 when she was nine months old.  For about eight years Andrea had to spend at least $800 a month to board and train Lamira, or about $75,000 in the aggregate.  At one point during the mid 1990s, Lamira was appraised for $25,000.  Later, petitioners received an offer to purchase Lamira for $110,000, which petitioners rejected.  Petitioners eventually sold Lamira at the age of 17 for $5,000.

In 1998 Andrea began to include the selling of her stallions' semen as part of the horse-breeding activity.  At the time, she had contracted to sell in 1999 roughly $25,000 worth of semen that would have produced 10 breedings.  Because the 1999 fire destroyed the semen and prevented Andrea from performing the contracts, Andrea did not complete any of the contracted sales and did not actually receive any income in 1999 from selling horse semen.  Petitioners did not contract for any sales of horse semen in any other year.

### 2. The Farmington property

Since 1989 when Andrea and her then husband purchased the Farmington Property, they had allegedly made certain improvements.  Presently, Andrea, Zavra, and Zavra's three-year-old child live at the residence on the Farmington property.[5]

_____

[5]For 2007, petitioners claimed utility and insurance expenses relating to their personal residence as part of the horse-breeding activity's expenses on their

(continued...)

[*17] There is nothing in the record showing the fair market value of the Farmington property and the improvements on the property.

    E.    <u>Time and efforts spent in the horse-breeding activity</u>

In 2007 Andrea worked 40 hours a week as a litigation investigator for Department of Transportation for the State of California. Andrea claims that she also worked 84 to 112 hours every week in petitioners' horse-breeding activity during all relevant times. Andrea also claims that in some years she had other part-time employments and worked 10 to 25 additional hours a week. According to Andrea, there were days when she worked two or three days through without sleep as well as days when she slept in the barn with the horses when the mares were about to give birth. She includes the number of hours spent sleeping with her horses as hours worked for the horse-breeding activity.

Even though petitioners hired manual labor from time to time, Andrea put in a lot of her own physical labor in the horse-breeding activity. For example, she physically built the barns herself--putting up outdoor shelters, digging holes for fence posts, setting the posts with cement, putting up plywood, and corrugating roofs. She also installed the watering systems to three of the barns and built

----

[5](...continued)
Schedule F.

[*18] arenas for horse training.  Andrea performed many repairs using her knowledge in welding work such as building a gate.

A typical day for Andrea at Queensland would start between 4 a.m. and 5 a.m. when she would go out to the farm and check on the horses and the other animals to make sure they were where they were supposed to be.  She would also feed the animals and closely examine them to make sure that they were eating and not lame and had no big cuts or scrapes.  In addition, she sometimes would need to "worm" the animals, which is a process of killing intestinal parasites.  Andrea has always been very meticulous and insisted on performing these tasks herself to ensure her animals receive the best care or at least the standard of care that would be satisfactory to her.

In 2007 Zavra worked at least 40 hours a week for the horse-breeding activity.  She was also employed part time as a "vendor rep" for Excell Marketing LC, working 2 to 16 hours per week.

F.    Petitioners' other activities engaged in for profit

During all relevant times, petitioners did not conduct any similar or dissimilar activities engaged in for profit.

[*19] G.     Intervening events

       1.     Selenium deficiency in the surrounding area

Around 1998 Andrea discovered that hay from her local area, which she used to feed her horses, was deficient in selenium.  A lack of selenium in a horse's diet would have a negative effect on the horse's muscles and could cause medical problems that can be life threatening.  To rectify the problem, Andrea began to import hay containing adequate amounts of selenium from other parts of the country.  Importing hay from other areas proved to be very costly--instead of $3 a bale for local hay, imported hay could cost petitioners as much as $17 a bale, or 600% more.

       2.     The 1999 fire

The 1999 fire caused damage to petitioners' residence on the Farmington property as well as property that was part of the horse-breeding activity.  The fire consumed many acres of the farm and other Queensland assets, such as inventory, blankets, show bridles, halters, show halters, and books and records of the activity. After the fire destroyed the barn, the barn was rebuilt and placed back in service around 2007.

The fire took down Queensland's utility lines for months, leaving it without electricity and running water while they were down.  One horse died from the

[*20] incident, and many others became stressed. It also destroyed the tanks that stored the horse semen petitioners had allegedly planned to sell. According to petitioners, the fire adversely affected petitioners' ability to breed horses because it destroyed much of the necessary equipment. The farm's reconstruction was not completed until 2008.

### 3. Missed inspection in 2001

Petitioners had organized an inspection to be conducted by the Swedish Warmblood Association of North America (SWANA) at the fairgrounds in Santa Rosa, California. Petitioners rented the fairgrounds and planned to have some of their horses inspected by the SWANA team. They anticipated future breeders and prospective Swedish warmblood buyers, who had previously contacted them to express interest in purchasing their horses, to attend the event. The inspection was scheduled to take place on September 12, 2001.

As a result of the terrorist attacks on the World Trade Center the day before the scheduled inspection, the SWANA inspectors were unable to travel to Santa Rosa and the inspection was canceled. Consequently, the SWANA team did not inspect the 15 to 19 horses that petitioners planned to bring to the inspection, and petitioners did not meet with the prospective buyers and breeders at the canceled event. Even though another inspection was set to take place the next day

[*21] on September 13, 2001, at Ms. Dilworth's Trilogy Farm in Santa Cruz,[6] petitioners took only one or two young stallions to that inspection (Santa Cruz inspection). Andrea explained at trial that logistical issues prevented the transport of the remaining horses to Santa Cruz.

Andrea could not recall whether she took her horses to another inspection in 2002; nor is there anything in the record showing they took any of their horses to an inspection in subsequent years. According to Andrea, horses must be inspected at a certain age to receive a certain type of recognition, and thus missing the inspection 2001 has had an adverse impact on the values of her horses. However, petitioners have failed to state or quantify with specificity the extent to which the missed inspection has had an adverse impact on the values of their horses.

H.    Partnership between Andrea and Zavra

In 2002 Zavra joined Andrea as a partner to conduct the horse-breeding activity. However, petitioners did not memorialize their alleged oral agreement to form a partnership. The arrangement between petitioners appears to be that Zavra would contribute her services as well as her wage income to pay certain expenses of the horse-breeding activity in exchange for a 50% interest in the partnership. Petitioners do not recall the amount of Queensland's expenses Zavra has paid on

---

[6]Farmington is about equidistant between Santa Cruz and Santa Rosa.

[*22] behalf of the partnership or the value of any property or services Zavra might have contributed to the partnership. Andrea's then husband also contributed about $2,000 every month--presumably while they were married--to the horse-breeding activity but did not receive any partnership interest in return and thus had never been a partner in the horse-breeding activity.

Petitioners filed Forms 1065, U.S. Return of Partnership Income, for 2002, 2003, 2005, and 2006.[7] For 2002 and 2003 petitioners answered "No" to the question "Is this partnership subject to the consolidated audit procedures of sections 6221 through 6223?" For 2005 and 2006 petitioners answered "No" to the question "Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year?"

OPINION

I. Jurisdiction

Generally, disputes over partnership items are subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982

_____

[7]In the record are Forms 1065 attached to Andrea's 2003 and 2005 Federal income tax returns (but not Zavra's returns for these years) and Forms 1065 to Zavra's 2002 and 2006 returns (but not Andrea's returns for these years). Despite the incomplete record, we are satisfied that both petitioners filed or at least intended to file an identical Form 1065 for each of these four years.

**[\*23]** (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648. See generally

secs. 6221, 6225(a). To decide whether a partnership engages in an activity for

profit under section 183, we determine profit motive at the partnership level. See

Hill v. Commissioner, 204 F.3d 1214, 1218 (9th Cir. 2000) (citing Polakof v.

Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), aff'g T.C. Memo. 1985-197,

and Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo

1991-212). Correspondingly, the disputed losses from Queensland are partnership

items of petitioners' partnership in the horse-breeding activity during the year at

issue.[8] Thus, absent an applicable exception, we do not have jurisdiction over the

disputed losses in these individual deficiency proceedings.

Section 6231(a)(1)(B) provides the so-called small partnership exception.

The term "partnership" under TEFRA does not include any partnership with 10 or

---

[8]"[T]he term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate." Sec. 761(a). A partnership exists when "the parties in good faith and acting with a business purpose intend[] to join together in the present conduct of the enterprise." Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). The parties do not dispute that petitioners intended to join together to conduct the horse-breeding activity through a partnership described in sect. 761(a). One question presented here is whether that activity was engaged in for profit in the year at issue. While we may occasionally refer to Queensland as a partnership throughout this opinion, we do not intend to suggest that Queensland was a profit-making, bona fide partnership for Federal income tax purposes.

**[\*24]** fewer partners who are individuals unless the partnership makes an election to have the TEFRA procedures apply. Sec. 6231(a)(1)(B)(ii).

Petitioners claim that they orally entered into a partnership agreement in 2002 to carry on the horse-breeding activity and that they were the only partners in the year at issue. Thus, their partnership is not a partnership under section 6231(a)(1)(B). Petitioners' Forms 1065 for their partnership for 2002, 2003, 2005, and 2006 show that they declined to make the election to have TEFRA apply. While there is no evidence of a Form 1065 filed for 2007, there is likewise no evidence showing petitioners filed a Form 8893, Election of Partnership Level Tax Treatment, and made an election under section 6231(a)(1)(B)(ii) in 2007 or any of the previous years to have the TEFRA procedures apply to them for 2007. We are thus satisfied that an election under section 6231(a)(1)(B)(ii) was not in effect for 2007.

Because petitioners' purported partnership is a "small partnership" that has not elected to have TEFRA apply for 2007, we have jurisdiction to review in these individual deficiency cases items otherwise subject to partnership-level proceedings, including the disputed losses from the horse-breeding activity. New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 173 n.3 (2009) (citing

**[\*25]** <u>Wadsworth v. Commissioner</u>, T.C. Memo. 2007-46), <u>aff'd</u>, 408 Fed. Appx. 908 (6th Cir. 2010).

## II.     Perception of Andrea and Zavra as witnesses

In all cases, we observe the candor, sincerity, and demeanor of each witness in order to evaluate her testimony and to assign weight to that testimony for the primary purpose of finding disputed facts.  We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case.  The mere fact that one party presents unopposed testimony does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor.  We will not accept a witness' testimony on its face if we find that our impression of the witness coupled with our review of the credible facts at hand conveys to us an understanding contrary to the spoken word.  <u>See</u> <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 84-87 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002); <u>HIE Holdings, Inc. v. Commissioner</u>, T.C. Memo. 2009-130, 97 T.C.M. (CCH) 1672, 1733 (2009), <u>aff'd</u>, ___ Fed. Appx. ___, 2013 WL 1365354 (9th Cir. Apr. 5, 2013).

We find Andrea's testimony to be generally unhelpful and unreliable.  Her testimony, especially during cross-examination, was ambiguous, equivocal, and sometimes evasive.  For example, Andrea was never able to provide during her

[*26] testimony a timeframe when the Farmington property became partly operational or fully operational after the 1999 fire. Her testimony was also contradicted several times by her responses to the interrogatories that respondent had previously propounded to her and other prior statements. For example, Andrea testified at trial that after the 1999 fire, she began to use an accounting software different from the one she used before the fire (i.e., Macintosh Quicken as opposed to Microsoft Quicken); however, her responses to respondent's interrogatories stated that she abandoned her previous accounting methods and devices altogether after July 1999, ostensibly to explain why she did not have an accounting system for the year at issue. As another example, Andrea testified that she took two young stallions to the Santa Cruz inspection, but her own notes next to a copy of a refund check from SWANA for inspection fees in connection with the Santa Cruz inspection state that she took only one stallion for inspection.

While we believe Zavra to be generally credible, we find her testimony similarly unhelpful and unreliable. She claims that she entered into a partnership with Andrea to carry on the horse-breeding activity for profit, but at the same time she testified she did not know about the finances of the activity and not even the $135,000 loss incurred in the year prior to her joining the partnership. It appears her knowledge of Queensland's operations and finances is extremely limited.

**[\*27]** In sum, we give petitioners' testimony little weight in our profit motive determination.

III.   "An activity not engaged in for profit"

Section 183 generally limits the deductions for an "activity not engaged in for profit" to the amount of gross income received from the activity.  Sec. 183(a) and (b).  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  In the Court of Appeals for the Ninth Circuit, the court to which an appeal of this case most likely lies, an activity is engaged in for profit if the taxpayer's "predominant, primary or principal objective" in engaging in the activity was to profit.  Wolf v. Commissioner, 4 F.3d at 713.  In this context, the term "profit" means economic profit, independent of tax savings.  Id.

Petitioners bear the burden of proving that they entered into and during the year in issue remained in the horse-breeding activity with a predominant, primary, or principal objective of earning a profit.  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1993); Giles v. Commissioner, T.C. Memo. 2005-28, 89 T.C.M. (CCH) 770, 775 (2005).  We determine profit intent on the basis of all surrounding facts and circumstances.  Golanty v. Commissioner, 72 T.C. 411, 426

**[\*28]** (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir.1981); sec. 1.183-2(b), Income Tax Regs. While our inquiry into a taxpayer's objective in engaging in an activity focuses on the taxpayer's subjective intent, we as the finder of fact need not rely solely on the taxpayer's statement of intent but may resort to objective facts to decide the true intent. See Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir.1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472; sec. 1.183-2(a), Income Tax Regs.

The regulations set forth a nonexclusive list of nine factors in ascertaining a taxpayer's objective in engaging in an activity: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort spent by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. None of these factors is controlling in and of itself, and a decision as to a taxpayer's intent is not governed by a numerical preponderance of the factors. Sec. 1.183-2(b), Income Tax Regs.; see

**[*29]** <u>also</u> <u>Golanty v. Commissioner</u>, 72 T.C. at 426; <u>Allen v. Commissioner</u>, 72 T.C. 28, 34 (1979). We will examine these factors in turn.

A. <u>The manner in which petitioners carried on the activity</u>

The fact that a taxpayer carries on an activity in a businesslike manner may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Subfactors to consider in deciding whether a taxpayer has conducted an activity in a businesslike manner include: (1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to those of other comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. <u>Giles v. Commissioner</u>, 89 T.C.M. (CCH) at 776 (citing <u>Engdahl v. Commissioner</u>, 72 T.C. 659 (1979)); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners argue that they conducted Queensland in a businesslike manner primarily on the basis of three claims: first, they developed a business plan that they have modified over the years to reflect changing business environment; second, they maintained complete and accurate records; third, they advertised the sales of their horses. Petitioners' claims are not supported by the record.

**[*30]**         1.        <u>Business plan</u>

Andrea allegedly devised a business plan as early as 1981 and submitted it to the SBA for feedback.  She again submitted a business plan in 1993, presumably updated from the 1981 plan, to the SBA to get further business advice.  But the 1993 business plan contains largely her descriptions of breeding and training horses and says very little about how to turn the activity profitable.  Moreover, when the business plan does touch on profit-minded matters, such as financials and startup costs, it includes only very high-level discussion that would leave any businessperson very few clues as to how to make a profit from Queensland.

Indeed, the 1993 business plan itself raises other red flags.  It states that Queensland is geared toward "the serious upper-level horse rider[s] * * * who are able to invest a great deal of time, effort, and money into their sport", suggesting that the market for selling Swedish warmbloods is a niche market with very few buyers.  On the other hand, the business plan also states that the ongoing operational costs are high.  On the basis of the history of Lamira, for example, we know a Swedish warmblood's value tends to decrease over time after it reaches its prime.  In other words, petitioners' business is selling a product that is subject to depletion and with significant overhead, and its target market is small and

**[\*31]** potentially highly competitive. We would expect a person who is seriously profit-minded to discuss in her business plan how she intends to control costs and overhead, to promote her products through consistent and aggressive marketing efforts to broaden the purchaser base, and to maximize the retail value of her horses by determining when it is the optimal time to sell. But petitioners' 1993 business plan fails to address any of these important business issues. Thus, we give the 1993 business plan very little weight.

We also find no credible evidence to support petitioners' claim that they regularly updated their business plan to reflect changing market conditions. Despite the discovery of selenium deficiency in the local hay in 1998, the 1999 fire, the terrorist attacks in 2001, and the economic downturn that followed, in addition to a history of substantial losses, there is no evidence showing petitioners have done anything to adapt to the market challenges or adopt new techniques and operating methods to turn the losing activity into a profitable venture. See sec. 1.183-2(b)(1), Income Tax Regs. Action--or inaction in this case--speaks louder than words. See Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C. M. (CCH) 2296, 2300 (1997) (finding business plan can be evidenced by action). Petitioners' inaction here convinces us that they did not change their business

**[\*32]** plan, if there ever was one, in a manner consistent with a business venture engaged in for profit.

2.      Maintaining complete and accurate books and records

The failure to keep financial records, such as journals, ledgers, income and expense reports, income statements, P&L statements, and financial projections indicates a lack of businesslike operations.  Giles v. Commissioner, 89 T.C.M. (CCH) at 776 (citing Surridge v. Commissioner, T.C. Memo. 1998-304). Although a taxpayer need not maintain a sophisticated cost accounting system for any purported business activity, she must at least keep and produce records that would enable her to make informed business decisions and otherwise allow her to cut expenses, increase profits, or evaluate the activity's overall performance.  Id. at 777 (citing cases).  Finally, the failure to maintain a separate bank account or to prepare a budget also indicates a lack of businesslike operations.  Id. at 776.

At the outset, we express our doubt over Andrea's testimony that she kept financial records for the horse-breeding activity using Macintosh Quicken after the 1999 fire (including the year in issue).  Her prior inconsistent statements given in response to respondent's interrogatories impeached that testimony.  Further, petitioners failed to corroborate their testimony that they kept complete and

[*33] accurate business records with documentary evidence. Thus, we decline to find as a fact that they continued to keep such books and records after the 1999 fire.

Even if we assume for the sake of the argument that petitioners used some sort of accounting system to keep track of Queensland's expenses and inventory, Andrea's own testimony reveals that they have never used the available data to produce or to prepare any P&L statements, earnings reports, budgets, break-even analyses, or any similarly detailed financial statements that would help them to cut expenses, increase profits, and evaluate the overall performance of their horse-breeding activity. See Golanty v. Commissioner, 72 T.C. at 430. At most, the types of records petitioners maintained would help them substantiate Queensland's expenses,[9] but that is insufficient to show they kept them in a business fashion to foster profit. See McKeever v. Commissioner, T.C. Memo. 2000-288, 80 T.C.M. (CCH) 358, 367 (2000). And the fact that Queensland incurred losses year after year allows us to draw a factual inference that in evaluating Queensland's declining financial performance, petitioners did not actually rely on any rough financial projection that they might have made as to the activity. Finally,

---

[9]In fact, petitioners' records can substantiate only $106,700 of the $210,847 expenses reported on their 2007 Schedule F.

[*34] petitioners stopped maintaining a separate bank account for the activity after 1999, making it harder to separate and track business expenses and personal expenses.[10]  In sum, petitioners failed to present credible evidence that they used any record to implement cost-saving measures or to improve profitability.

### 3. Advertising

Petitioners rely on a handful of advertisements placed idly in trade magazines and publications to argue that they "embarked on an intensive advertising program" to market their products.  As we noted earlier, the nature of petitioners' target market would require them to market their products competitively and aggressively to reach a broad buyer base.  We find it difficult to believe that only a handful of advertisements placed in trade magazines and publications can achieve that result.  Indeed, the small volume of sales petitioners generated over the years allows an inference that their advertising efforts were futile.  Thus, their failure to expand their marketing efforts over the years to reach a larger customer base is not consistent with the behavior of a profit-oriented taxpayer.  See McKeever v. Commissioner, 80 T.C.M. at 368 (citing Dodge v.

---

[10]There is at least one other instance of commingling accounts. For 2007 petitioners reported utility and insurance expenses relating to their personal residence as part of the horse-breeding activity's expenses on their Schedule F.

[*35] <u>Commissioner</u>, T.C. Memo. 1998-89, <u>aff'd without published opinion</u>, 188 F.3d 507 (6th Cir. 1999)).

Moreover, petitioners fail to provide any evidence to show their participation in certain marketing events actually generated any actual leads or sales. It is unclear whether petitioners have ever examined the effectiveness of their advertising efforts and whether they have explored other marketing avenues.

In sum, we give little weight to petitioners' claim that they engaged in advertising in a businesslike manner.

### 4.  Insurance coverage

Petitioners did not have adequate insurance coverage to insure Queensland's assets against casualty loss. As a result, petitioners were not able to recover the value of Queensland's assets after they were destroyed in the 1999 fire. Not having adequate insurance coverage is inconsistent with carrying on an activity in a businesslike manner.

### 5.  Changing methods to improve profitability

A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods may also indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs.

[*36] Petitioners claim that they began to sell their stallions' semen as a way to generate additional profit. In 1998 they contracted to sell about $25,000 worth of semen that could produce 10 breedings. Assuming petitioners could sustain the same level of semen sales every year after 1999, the sales would generate only very moderate income but would do little to affect the activity's bottom line. Queensland was incurring expenses of $100,000 or more every year. The amount of income that any semen sales could potentially generate would be insufficient to defray Queensland's annual expenses, not to mention to recuperate losses from the previous years.

In fact, petitioners were never able to generate any income from the sales of semen. Petitioners blame the failure in making semen sales on the 1999 fire, which they claim destroyed the semen that they could have sold. But petitioners fail to explain why they could not sell semen in other years after the fire.

Indeed, petitioners blame a series of unfortunate events for their losses: the discovery of selenium deficiency in local hay in 1998, the 1999 fire, the terrorist attacks in 2001, and the recession. We do not doubt that these events had a serious impact on petitioners' activity, so much so that they might have crumpled a business. But facing these multiple hurdles and setbacks of the magnitude petitioners are pleading, a profit-minded person likely would have cut her losses

**[\*37]** and abandoned the venture altogether, unless there was some reasonable expectation that she could overcome these hurdles by adopting new strategies or techniques to improve profitability. Absent such reasonable expectation, a profit-oriented person likely would not continue to pour money into a losing venture.

Petitioners want us to believe the above unfortunate events affected their ability to make Queensland profitable. Be that as it may, petitioners fail to tell us what they have done to adapt to and to adjust their methods to meet these challenges. Indeed, the record shows they have done very little. Recovery could take time, especially given the economic environment, but there had been six to nine years between the intervening events and the tax year at issue, and all signs were pointing to a grimmer outlook. Notwithstanding that, petitioners continued to contribute substantial amounts of their own cash into the activity without any change in their way of running Queensland. Petitioners' failure to improve profitability and unwillingness to abandon the venture under the circumstances only lead us to conclude as a factual matter that they were personally attached to the venture and their "predominant, primary or principal objective" was not to profit.

**[*38]**      6.      Conclusion

There is no credible evidence showing that petitioners carried on their horse-breeding activity in a businesslike manner. This factor favors respondent.

B.      The expertise of petitioners or their advisers

A taxpayer's expertise, research, and study of the accepted business, economic, and scientific practices of an activity, as well as his or her consultation with experts, may be indicative of a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. In a case concerning a horse-breeding activity, our focus is to examine a taxpayer's knowledge of the business or economic aspects of horse breeding as opposed to her knowledge on the subject of horse breeding from the perspective of a horse breeder. See Giles v. Commissioner, 89 T.C.M. (CCH) at 778.

Petitioners assert that they sought business advice from the SBA in San Francisco first in 1981 and again in 1993 around the time when they started the activity. They also point out that they sought business and marketing advice from Ms. Dilworth in the early 1990s. Finally, they claim that they asked for business advice from other breeders here and in Sweden about breeding and training Swedish warmbloods.

At the outset, we note that, besides petitioners' self-serving and vague testimony about having received some unspecified expert advice, the record is

[*39] devoid of credible evidence suggesting that petitioners prepared for the economic aspects of the activity by study or consultation with experts or that they were informed of what the ultimate costs might be, how they could achieve any level of cost efficiency, the amount of revenue they could reasonably expect, or any potential risks that might negatively affect their breeding activity.  See id.

Further, the credible evidence in the record does not show petitioners have sought relevant business advice.  With respect to the advice they sought from the SBA, there is no credible evidence to show that petitioners talked to anyone from the SBA who was knowledgeable of horse breeding or the economic aspects of a horse-breeding business.  In fact, Andrea acknowledged at trial that the individual who allegedly advised her had no knowledge about horse breeding or its business aspects.  Further, Andrea went to the SBA between the early 1980s and the early 1990s.  But petitioners cannot explain how any business advice that they obtained then would continue to be relevant to their horse-breeding activity after 1998, which marked the beginning of a series of "unfortunate" events and disasters (i.e., the 1999 fire, the recession, etc.) that allegedly had an unforeseen impact on their activity.  In the same vein, any advice petitioners might have obtained from other breeders in the United States and abroad two decades ago would be unhelpful.

[*40]  Petitioners' claim that they relied on Ms. Dilworth's advice is similarly unpersuasive.  When petitioners approached Ms. Dilworth in the early 1990s, Ms. Dilworth had been in the horse-breeding business for no more than five years.  In the light of our decision in Engdahl in which we found the startup phase of a horse-breeding activity to be 5 to 10 years, see Engdahl v. Commissioner, 72 T.C. at 669, we have reservations over Ms. Dilworth's qualification as an expert in the business and economic aspects of breeding Swedish warmbloods at that time.  Moreover, despite the frequent initial visits and telephone calls, petitioners had not spoken to Ms. Dilworth much in the past 10 years.  Any relevant advice Ms. Dilworth might have given in the 1990s, just like the advice from the SBA, would no longer be relevant given the new problems facing petitioners during the years since 1998.

The lack of business contact between Ms. Dilworth and petitioners in the last 10 years is significant.  One would expect that a profit-minded taxpayer would have sought out Ms. Dilworth--or the SBA--for updated advice based on new information about the new challenges petitioners were then facing.[11]  Petitioners'

---

[11]Indeed, Ms. Dilworth testified that "there are very few people in the world right now that are making any money breeding horses."

**[\*41]** failure to at least attempt to obtain updated and relevant business advice after the intervening events is inconsistent with an intent to profit.

This factor favors respondent.

C.     The time and effort spent by petitioners in carrying on the activity

The fact that a taxpayer devotes much of her personal time and effort to an activity may indicate a profit objective, especially where the activity does not involve substantial personal or recreational aspects. Giles v. Commissioner, 89 T.C.M. (CCH) at 779 (citing McKeever v. Commissioner, T.C. Memo. 2000-288 and Daley v. Commissioner, T.C. Memo. 1996-259). A taxpayer's withdrawal from another occupation to devote his or her time and effort to an activity also may indicate a profit objective. Id. (citing Burleson v. Commissioner, T.C. Memo. 1983-570); sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners allege that they performed almost all of the work with little help from hired labor. Andrea claims she spent 84 to 112 hours week in the horse-breeding activity in addition to working 40 to 65 hours a week in her full-time and part-time jobs. Zavra asserts she worked 40 hours a week in the horse-breeding activity and 2 to 16 hours a week in her part-time job.

We find petitioners' assertions to be incredible. First, petitioners presented no documentary evidence or testimony from third parties to support their claims or

**[\*42]** the proposition that 100% of the time they spent was for business. Andrea acknowledged at trial that some of the 84 to 112 hours included time she slept in the barn with her horses. Thus we discount her testimony that 100% of her time was spent for business. There is likewise a lack of credible evidence to show that Zavra's 40 hours spent every week was all business, especially in the light of the fact that Queensland has been a family activity in which she spent many hours with her family.

We also note that Andrea's testimony was incredible on its face. By her count, between her other employments and time spent on the activity, she worked 124 hours to 177 hours a week when there are only 168 hours in a week. The only way she could possibly work this many hours is by neither sleeping nor eating for days. Without any other evidence to corroborate this fantastical claim, we decline to accept it.

Moreover, Andrea never decreased the number of hours worked in her full-time job; sometimes she even worked extra hours in her part-time employments. Thus, we draw an inference from this fact and believe that Andrea had to keep her paid employments in order to subsidize her losing horse-breeding activity. In other words, if Andrea really expected that the activity was on its way to turn a profit, one would expect that she would have slowly phased out of her full-time

**[\*43]** and part-time jobs and focused her energy primarily on Queensland. Because she did not, we suspect that she intended to continue to rely on her other employment to make a living and subsidize the horse-breeding activity.

This factor favors respondent.

D. <u>The expectation that assets used in the activity may appreciate in value</u>

A taxpayer's expectation that assets such as land and other tangible property used in an activity may appreciate to create an overall profit may indicate that the taxpayer has a profit objective as to that activity. Sec. 1.183-2(b)(4), Income Tax Regs. An overall profit is present if net earnings and appreciation are enough to recoup losses sustained in prior years. <u>Giles v. Commissioner</u>, 89 T.C.M. (CCH) at 779 (citing <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), <u>aff'd</u>, 379 F.2d 252 (2d Cir. 1967)).

Petitioners claim that they reasonably expected that their inventory and the Farmington property would appreciate to generate an overall profit. The credible evidence in the record does not support such a claim.

As to the Farmington property purchased in 1989, petitioners have failed to produce any credible evidence to suggest that it has appreciated sufficiently to offset over $1.8 million of losses Queensland suffered between 1993 and 2009.

**[\*44]** Nor is there any credible evidence showing the specific fair market value of the Farmington property.

As to the horses, by Andrea's admission, she projected that she could sell all of her horses for $225,000 to make a $15,000 profit for 2007.[12]  In other words, at the time she made the projection for 2007, she no longer expected that she could recuperate Queensland's prior losses of more than $1 million.  Yet she continued to invest more than $200,000 in the activity in 2007.  This is inconsistent with a profit intent.

Setting aside petitioners' inability to recoup all prior losses, Andrea's expectation that she could make a $15,000 profit for 2007 was itself unrealistic. To create that profit margin, petitioners would have to sell all of her 29 horses at about $7,750 per horse.  The most petitioners have ever received from selling a horse was $6,500 in 1997--which was before the fire, the terrorist attacks, and the recession--and the most horses petitioners have ever sold in any given year was three in 2003.  The projection, obviously based on an assumption that would have been used by only the most incorrigible optimist, is overwhelming evidence of the

_____

[12]Andrea's testimony shows that petitioners at one point hoped to sell their horses for $50,000 to $60,000 each.  However, it is clear from Andrea's testimony that she no longer had that expectation by the time she made her income projection for 2007.

**[*45]** absence of a profit motive. See Swigert v. Commissioner, T.C. Memo. 1982-500, 44 T.C.M. (CCH) 992, 996 (1982); Wittstruck v. Commissioner, T.C. Memo. 1980-62, 39 T.C.M. (CCH) 1168, 1170 (1980) ("Continued retention of the * * * [disputed activity] after any reasonable hope of profit has clearly been ruled out makes it very difficult for us to find a good faith expectation of profit."), aff'd, 645 F.2d 618 (8th Cir. 1981).

This factor favors respondent.

E. Petitioners' success in carrying on other similar or dissimilar activities

Although an activity is unprofitable, the fact that a taxpayer has previously converted comparable activities from unprofitable to profitable enterprises may show a profit objective. Sec. 1.183-2(b)(5), Income Tax Regs.

The record shows that petitioners have not engaged in other activities similar or dissimilar to the horse-breeding activity by which we may evaluate their success in those other activities. Thus, this factor is neutral. See Rundlett v. Commissioner, T.C. Memo. 2011-229, 102 T.C.M. (CCH) 307, 310 (2011); Whitecavage v. Commissioner, T.C. Memo. 2008-203, 96 T.C.M. (CCH) 119, 122 (2008).

[*46] F.     The history of income or losses with respect to the activity

The fact that a taxpayer incurs a series of losses beyond an activity's startup years may indicate the absence of a profit objective as to that activity unless the losses are attributable to unforeseen or fortuitous circumstances beyond the taxpayer's control.  Sec. 1.183-2(b)(6), Income Tax Regs.  We have previously held that the startup phase of a horse-breeding activity may be 5 to 10 years.  See Engdahl v. Commissioner, 72 T.C. at 669.

Petitioners argue that their losses following the startup years were attributable to unforeseen and fortuitous circumstances beyond their control.  We disagree.

1.     Selenium deficiency

In 1998 petitioners discovered hay local to Queensland did not have adequate selenium, resulting in selenium deficiency in their horses' diet that could cause serious medical problems to their horses.  As a result, petitioners had to import hay from other areas at significant costs.  While the discovery might have been unforeseen in 1998, the problem was ongoing and by 2007 it was no longer an unforeseen or fortuitous event.  One would thus expect a profit-oriented person to explore other more cost-effective alternatives; or if breeding and raising horses at the same location continued to be cost prohibitive, one would expect it to be a

[*47] factor to consider in deciding whether to relocate the activity or to abandon it altogether. Petitioners' failure to show us that they have considered these business issues makes it difficult for us to believe that their decision to stay at the same location was motivated by profit.

2. 1999 fire

Petitioners contend that the 1999 fire also adversely affected their horse-breeding activity because it destroyed some inventory (mostly semen) and the equipment for breeding horses. Andrea testified that the farm's reconstruction was not completed until 2008; however, it is not clear when Queensland returned to being operational.

On the basis of petitioners' own testimony, it appears the 1999 fire affected only their ability to breed horses and sell semen. Petitioners presented no credible evidence that can substantiate a claim that the fire prevented them from continuing to train and sell their horses in stock. If, for the sake of argument, the fire completely shut down Queensland so that petitioners were no longer able to train and sell their horses until they completed the reconstruction in 2008, we question why any profit-minded person would continue to hold on to the inventory during the 10-year period instead of relocating or liquidating the inventory. If the fire did not affect petitioners' ability to train and sell their horses, Queensland's history of

[*48] generating dismal income from selling horses leaves us unpersuaded that the 1999 fire had anything to do with the activity's bottom line.

Finally, we attribute losses resulting from the fire to petitioners' failure in the first instance to get adequate insurance coverage on the activity's property; getting sufficient insurance coverage was something within their control and what they could have done. If petitioners had bought adequate insurance coverage as a business-minded person would have, they could have recovered any casualty loss and rebuilt the farm more quickly.

In sum, we decline to find that the activity's losses can be attributed to the 1999 fire when petitioners could have prevented and mitigated some if not most of the losses.

### 3. Missed inspection in 2001

Petitioners also assert that the missed horse inspection in Santa Rosa in 2001 negatively affected the marketability of their horses and thus their values. We find petitioners' argument incredible on its face.

The lack of evidence showing petitioners have taken any of their horses to an inspection since 2001 leads us to find that they did not do so. If inspections were important, as petitioners claim, to marketing a horse and increasing its value, we question why petitioners failed to take any of the horses that missed the 2001

[*49] inspection to another inspection in subsequent years to obtain value-enhancing diplomas for these horses.

Andrea testified that horses must be inspected at a certain age. This testimony suggests that many of the horses that missed the 2001 inspection would not be eligible for another inspection in a subsequent year. If so, there would be little hope that these horses would appreciate if their value depended on inspection. Thus, petitioners' decision to continue to hold on to these horses with no reasonable expectation for appreciation is inconsistent with a profit intent, especially in the light of the fact that keeping these horses requires substantial costs. Either way, there is no credible evidence to support petitioners' claim that the activity's losses can be attributed to the missed inspection in 2001.

4. Depressed market conditions during the recession

Finally, petitioners attribute their losses to the recession in the 2000s and the resulting depressed market conditions. They argue that their case is "strikingly similar" to Engdahl. We disagree.

In the Engdahl case, we agreed with the taxpayers that their losses from the horse-breeding activity could be explained by a series of unfortunate events beyond their control. Engdahl v. Commissioner, 72 T.C. at 669. Some of these events included a change in market conditions and the rising costs associated with

[*50] maintaining and training horses.  But in <u>Engdahl</u>, unlike in the present case, we found there was a profit intent because the taxpayers there made changes to their operation; and when they realized their activity would not become profitable, they attempted to sell it.  <u>Id.</u>  Here, as we stated earlier, petitioners did not present credible evidence that they made any changes to their operation or adopted any new techniques or business methods to weather the recession; nor have they tried to dispose of the activity when it should have become apparent that the activity would not be profitable.  Even after 2007, the year when the activity's earnings did not meet petitioners' expectation according to Andrea's own testimony, petitioners continued to incur additional expenses of about $200,000 in 2008 and about $130,000 in 2009.  This is yet more overwhelming evidence that shows a lack of profit intent.

5.  Conclusion

For reasons stated, this factor favors respondent.

G.  The amount of occasional profits

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective.  <u>See</u> sec. 1.183-2(b)(7), Income Tax Regs.  Absent actual profits, the opportunity to earn substantial profits in a highly speculative venture may be

[*51] enough to indicate profit intent. See id.; see also Giles v. Commissioner, 89 T.C.M. (CCH) at 780-781 (citing Dawson v. Commissioner, T.C. Memo. 1996-417).

Petitioners argue that they embarked on a business to introduce a popular but underrepresented breed of performance horse to the United States and it presented an opportunity for significant profit. We are not persuaded.

Petitioners, again, presented no credible evidence, other than their self-serving and vague testimony, that they could sell their horses at top prices to offset 15 years of losses. Petitioners' speculation was not grounded in anything other than an empty aspiration that is insufficient to overcome the complete absence of profits in Queensland's history. In these 15 years, none of petitioners' horses, except Lamira, was of the quality to generate top prices. When someone offered to buy Lamira for $110,000, petitioners rejected the offer. Petitioners have not brought any of their horses to another inspection since 2001 and have not attempted to expand their customer base by engaging in more aggressive advertising or marketing. Petitioners' conduct during these years simply does not support their contention that "significant profit" sufficient to offset their substantial accumulated losses was attainable.

In sum, this factor favors respondent.

[*52] H.    Petitioners' financial status

A taxpayer's lack of substantial income or capital from sources other than an activity may indicate that the activity is engaged in for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.  The fact that a taxpayer does have substantial income from sources other than an activity, on the other hand, may indicate that the activity is not engaged in for profit.  The latter is especially true where losses from the activity generate substantial tax benefits or where there are personal or recreational elements involved.  Sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners maintain that they are not wealthy individuals and that they used their wage income and other savings to finance their horse-breeding activity.  Petitioners argue that this factor thus lies in their favor.  We disagree.

We have previously held that section 183 does not apply only to wealthy taxpayers who engage in unprofitable activities to create "paper" losses to offset against unrelated income.  Ranciato v. Commissioner, T.C. Memo. 1996-67, 71 T.C.M. (CCH) 2116, 2119 (1996).  Under this factor, we compare the income generated by an activity with the taxpayer's taxable income from sources other than the activity and query whether the taxpayer's ability to earn income elsewhere allows her to finance an otherwise unprofitable activity from which she derives some personal or tax benefits.  See id.

[*53] Between 1993 and 2008, petitioners together had a combined wage income of $1.2 million.[13]  On the other hand, Queensland's income during the same period was less than $15,000 but it incurred more than $1.6 million in expenses.  To finance these expenses, petitioners used their wage income as well as life insurance proceeds, proceeds from a 2005 home equity loan, and personal savings.[14]  The income and funds from these other sources thus enabled petitioners to engage in their horse-breeding activity that, as we discuss below, has strong personal elements.

Moreover, the losses from Queensland significantly reduced petitioners' tax liability between 1993 and 2008--that is to say petitioners paid <u>zero</u> Federal income tax on a combined income of $1.2 million from these 15 years.  Thus, the tax liability petitioners would have incurred but for Queensland's losses has gone to subsidize an activity that lacks a profit motive.  This is a substantial tax benefit.

This factor favors respondent.

---

[13]Zavra did not file a Federal income tax return before 2002 and thus had no reported wage income.  As to Zavra, this figure includes only her wage income beginning in 2002.

[14]It is also telling that petitioners never attempted to finance Queensland with a commercial loan; or if they tried to apply for one, they did not get one. While it is not a requirement, financing an activity with a business loan from a disinterested party at arm's length is indicative of the for-profit nature of the activity.

**[*54]** I.     Elements of personal pleasure or recreation

The presence of personal pleasure or recreation from an activity may indicate the absence of a profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. The mere fact that a taxpayer derives personal pleasure from an activity, however, does not necessarily mean that she lacks a profit objective with respect to the activity. A profit objective may be present in the latter case if the activity is truly engaged in for profit as evidenced by other factors. Giles v. Commissioner, 89 T.C.M. (CCH) at 781 (citing Jackson v. Commissioner, 59 T.C. 312, 317 (1972)).

Petitioners argue that the record does not have any evidence that petitioners ever rode horses for pleasure. They also point out that Andrea does not enjoy horseback riding on account of an old injury.

In these cases, we believe petitioners derive pleasure from their horse-breeding activity because they are attached to their horses. Both Andrea and Zavra grew up around horses. Even though Andrea may no longer ride horses, we believe that she enjoys being around them. Zavra has always enjoyed being around horses and at one point aspired to be a horse veterinarian. This attachment may explain why petitioners would not let go of their horses and continue to incur substantial expenses to care for them.

[*55] We also believe Andrea derives an additional pleasure from having her family live in the same household that Queensland has made possible. Further, Andrea, through Queensland, has been able to provide a secure and permanent environment for her daughter to engage in an activity for which Zavra has a special passion. As we have stated before: "The gratification derived from an occupation worth doing, possibly beneficial to others, and probably requiring long hours of arduous labor, must still not be confused with an intention to return a profit." White v. Commissioner, 23 T.C. 90, 94 (1954), aff'd, 227 F.2d 779 (6th Cir. 1955).

This factor favors respondent.

J.    Conclusion

We conclude on the basis of our discussion above that petitioners did not carry on their horse-breeding activity in 2007 with a predominant, primary, or principal profit objective.

IV.    Accuracy-related penalty

Respondent determined that petitioners are liable for accuracy-related penalties for 2007 because petitioners substantially understated their income tax or, alternatively, because they were negligent or disregarded rules or regulations. See sec. 6662(a) and (b)(1) and (2). There is a substantial understatement of

**[\*56]** income tax if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on a return for a taxable year or $5,000. Sec. 6662(d)(1)(A). Alternatively, we will sustain respondent's determination to impose accuracy-related penalties if we determine petitioners failed to make a reasonable attempt to comply with provisions of the internal revenue laws or disregarded rules or regulations by acting carelessly, recklessly, or with intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Only one accuracy-related penalty may be imposed for a given portion of an underpayment even though that portion implicates more than one form of misconduct described in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs. Because respondent has carried his burden under section 7491(c) to show that petitioners' losses claimed for 2007 resulted in substantial understatements of their income tax, we need not decide whether petitioners would also be liable for the penalties by reason of negligence or reckless disregard of rules or regulations.

Once respondent has proved his prima facie case for imposing penalties under section 6662(a), petitioners bear the burden of proving that the penalties are unwarranted by establishing an affirmative defense such as reasonable cause or substantial authority. See secs. 6664(c)(1), 6662(d)(2)(B).

**[\*57]** Although we have determined that petitioners' horse-breeding activity was not engaged in for profit, under the circumstances of this case, we find that petitioners "made a reasonable and good faith error in applying the law to the facts of this case." See Connolly v. Commissioner, T.C. Memo. 1994-218, 67 T.C.M. (CCH) 2973, 2974 (1994), aff'd, 58 F.3d 637 (5th Cir.1995). Petitioners have indeed made some good-faith efforts to comply with the law, but those efforts nonetheless fell short. Accordingly, on the specific facts of this case, the totality of the circumstances, and evidence presented at petitioners' trial, we find petitioners not liable for the section 6662(a) accuracy-related penalties for the year at issue.

V.    Conclusion

Any arguments not discussed in this opinion are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

Decisions will be entered under

Rule 155.